# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| QWIKCUT, LLC, a Florida Limited Liability Company,<br><br>    Plaintiff,<br><br>    v.<br><br>HUDL INC.,<br><br>    Defendant. | Case No.: 2:26-cv-02334-CCC-JBC<br><br>**AMENDED (CORRECTED) COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED (CORRECTED) COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

PARTIES ...............................................................................................................7

JURISDICTION AND VENUE ............................................................................8

FACTUAL ALLEGATIONS .................................................................................9

    A.  High School and College Sports...................................................................9

    B.  The Sports Video Analysis Industry and Hudl's Formation.........................12

    C.  Hudl Unlawfully Acquires and Maintains Monopoly Power........................14

        1.  Hudl Acquires Its Primary Competitors.............................................16

        2.  Hudl Constructs Technological Barriers to Restrict Consumers and Eliminate Competition .......................................................................19

            a.  Hudl Controls League Exchanges .........................................19

            b.  Hudl's Practices Make Direct Video Sharing Difficult or Impossible..............................................................................26

            c.  Hudl Refuses to Provide API Access.....................................31

        3.  Hudl Maintains its Monopoly Power Through Exclusive Agreements........................................................................................37

        4.  Hudl Engages in Exclusionary Pricing and Bundling Practices to Hinder Competition.............................................................................40

    D.  Anticompetitive Effects .............................................................................43

        1.  Hudl Charges Supracompetitive Prices..............................................43

        2.  Hudl Offers Degraded Services and Hinders Innovation....................45

        3.  Hudl Artificially Restricts Consumer Choice ....................................49

    E.  Hudl Has No Procompetitive Justification for its Anticompetitive Conduct....................................................................................................52

    F.  Relevant Market........................................................................................53

    G.  Hudl Monopolized the Relevant Market ....................................................62

ii

H.  QwikCut Has Suffered Antitrust Injury .........................................................65

CLAIMS FOR RELIEF .................................................................................................66

PRAYER FOR RELIEF .................................................................................................70

DEMAND FOR JURY TRIAL ......................................................................................71

Plaintiff QwikCut, LLC ("QwikCut") hereby sues Hudl, Inc., ("Hudl"), and alleges as follows:

## INTRODUCTION

1.  In high school and college sports, coaches and teams rely heavily on game film to analyze opponents, develop game strategies, and prepare for competition.  In an era of intense competition and massive NIL deals, the ability to seamlessly share and access video footage between teams is critical to the operation of every sports program.

2.  Yet the market for software, hardware, and services that operate together to capture, store, analyze, and exchange sports videos for U.S. school sports and athletics programs is dominated by a single firm:  Hudl.  Hudl has captured over 20,000 high schools, totaling 99% of the high school market, and has captured approximately 99% of college athletic programs outside Division I schools.  According to Hudl itself, "[w]ith 99% of US high schools counting on Hudl . . . , it has a foothold in virtually every community nationwide."

3.  Hudl's monopoly power is not a historical accident.  From the beginning, Hudl has systematically eliminated competitors.  In 2011, for example, Hudl acquired Digital Sports Video, the company's primary competitor, almost doubling the number of high schools under its control and acquiring one of its few competitors in the college market.  And in 2012, less than a year later, Hudl bought

1

out its next largest competitor—APEX Sports Software—locking up the vast majority of the market. Over the years, Hudl has continued to consolidate the industry.

4. Beyond eliminating competitors through acquisitions, Hudl has imposed barriers that preclude meaningful entry into the market. Across the country, for example, Hudl has entered exclusive partnerships with state, county, and collegiate athletic associations, such as the Michigan High School Athletics Association, the Virginia Independent Schools Athletic Association, the Georgia Athletic Coaches Association, and the Conference Carolinas, requiring member schools to exchange film over Hudl.

5. Hudl has also leveraged its market power to secure exclusive contracts with two of the largest football coaching clinics in the country: Glazier Clinics and the Nike Coach of the Year Football Clinics. Glazier and Nike host conferences across the country "where coaches from all levels come together to learn from some of the best minds in the game." Historically, Hudl has excluded competitors from these opportunities to share their product with coaches—opportunities Hudl has recognized are essential in selling to coaches.

6. Hudl has also engaged in exclusionary bundling and pricing practices intended to maintain its monopoly over the market. Hudl charges customers more money for a package with less sports—to lock customers into using Hudl exclusively

for all sports. Hudl, for example, often *raises* its total subscription prices when customers seek to use the Hudl platform for *fewer* sports—as a means of locking consumers into the Hudl platform and preventing competitors from entering the market. There is no procompetitive justification for charging a higher *total* price for less access over the same length of time. Hudl has also bundled certain products and offered discounts reaching thousands of dollars to customers opting into the bundle to avoid competition on the merits in the sports video analysis market. Hudl also links its products and services in ways that prevent users from departing the Hudl ecosystem. For example, Hudl's cameras are the "only camera that uploads automatically to Hudl" and these cameras integrate only with the Hudl platform, rendering it impractical for schools with a Hudl camera to use another platform for a subset of sports.

7. Most importantly, Hudl has constructed technological barriers that prevent sports teams from freely sharing their film across platforms—both at a league level and an individual level. On a league level, a key feature of Hudl's platform is its "League Pools" or "League Exchanges." These league exchanges allow schools within the league to easily upload and access game footage from other schools in the league. They are, in other words, centralized repositories of game film across teams in a given league.

3

8.     But Hudl does not provide its users—*i.e.*, the owners of the game film—or independent third-party developers the information and protocols they would need to create league exchanges that would operate across platforms.  By making league exchanges accessible only through its platform, Hudl locks in schools to its platform:  a team that leaves Hudl loses access to critical film from their conference—the film they need to compete.  Because Hudl has captured 99% of high schools and colleges outside the DI level and has refused to allow league exchanges across platforms, moving to a rival platform would mean sacrificing access to these league pools.  Hudl's practices thus restrict users and hinder competition.  The result is higher prices, fewer choices, and the absence of meaningful competitive pressure on Hudl to improve its product.

9.     On an individual level, Hudl has instituted similar barriers.  Within the Hudl ecosystem, Hudl users can easily exchange game film with other Hudl users—within a few clicks and a few seconds.  But Hudl has made it difficult for Hudl users to send and receive film to and from non-Hudl users.  Rather than transferring from the website with a click of the button, transfers to or from other platforms often require reaching out to opposing coaches by phone or email to ask for the exchange, downloading large video files which can take hours, sending the film over a shared file, and manually organizing camera angles to reassemble game film. Because Hudl has captured nearly the entirety of the market and has artificially imposed

4

technological obstacles on team-to-team exchanges, schools have virtually no choice but to stay on Hudl's platform to compete.

10.   None of this is necessary.   In other industries, consumers can seamlessly connect across platforms—resulting in highly competitive industries that compete for business on the merits rather than on network or lock-in effects.  In the banking industry, for example, a customer of Bank of America can seamlessly transfer funds to a customer of Chase through national ACH operators.  In the healthcare industry, customers can access medical records from various providers through patient portals.  In the cell phone industry, an AT&T user can seamlessly call a Verizon user, despite being on different networks.  In each of these examples, these companies have allowed access to their Application Programming Interfaces ("APIs"), which are sets of rules and protocols to permit different software applications to communicate and exchange data within and across platforms.

11.   But Hudl refuses to unlock its APIs to facilitate video exchange across platforms.  By denying access to its APIs, Hudl has chosen to outright block technologies that would increase competition in the sports video analysis market by facilitating film exchange across platforms.  With APIs, cross-platform exchanges would be seamless so users would not be locked into Hudl's service.  Rather than being forced to use Hudl to effectively scout their competition, users would be able to do that from any platform.  Hudl would need to compete on the merits.  Instead,

5

to protect its monopoly—and the extraordinary profits that monopoly generates—Hudl has chosen to erect barriers to prevent competition from emerging.

12.   The results have been predictable.  With approximately 99% of the relevant market under Hudl's grasp and unconstrained by competition, Hudl has imposed supracompetitive prices, degraded the quality of its product, and hindered innovation in the industry.  Over the years, Hudl's prices have skyrocketed and Hudl now charges roughly double what its few competitors charge.  While Hudl has raised prices for its services, it has simultaneously lowered storage limits—requiring teams to purge prior years' game film—and dropped in customer service.

13.   QwikCut is one of the few companies that offers a comparable sports video analysis platform.  Hudl's conduct has injured QwikCut and degraded competition.  QwikCut offers unlimited storage, player grading, advanced stats, and other services outpacing Hudl.  Despite offering a similar product with superior service and significantly lower prices, QwikCut has effectively been shut out of the market as a result of Hudl's anticompetitive conduct.

14.   In short, Hudl has barred interoperability and weaponized its dominance in competition among platforms to trap users, suffocate rivals, and elude competition in the marketplace.  Hudl has strong incentives to continue this conduct and further solidify its dominance in the market.

6

15. New Jersey high schools have borne the brunt of this monopoly. QwikCut became the official video partner for the New Jersey Super Football Conference for the 2023-24 season. The New Jersey Super Football Conference is the largest football-only conference in the United States with more than 110 high schools. The conference leadership sought to confront the Hudl monopoly and reduce rising costs for member schools. Although many member schools switched to QwikCut and received lower prices and better service, nearly all of them switched back to Hudl because of the monopolistic practices set forth in this complaint. Many more schools never made the switch to QwikCut for the same reasons. Accordingly, QwikCut brings this action to halt and remedy Hudl's unlawful acquisition and maintenance of monopoly power and its attempted further monopolization of the nationwide market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, and exchanging sports video and data for U.S. school sports programs and athletic departments (the "Relevant Market").

## **PARTIES**

16. Plaintiff QwikCut is a Florida Limited Liability Company with its principal place of business in Deland, Florida. QwikCut provides video capture, storage, analysis, and solutions for professional and amateur sports programs, including high schools.

17.    QwikCut, one of Hudl's few competitors, came into being in 2015 and launched its cloud-based platform in 2017.  QwikCut was founded by Todd Denoyer, who had worked with high schools on filming, coached high school basketball and football, and saw that those schools had no choice but to submit to Hudl's rising prices.

18.    Defendant Hudl is a Delaware corporation with its principal place of business in Lincoln, Nebraska. Hudl offers various suites of software and services for sports video analysis, exchange, and related products used by professional sports teams and amateur sports, including high schools, across the world.

## JURISDICTION AND VENUE

19.    QwikCut brings this antitrust action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries it sustained; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) because this case arises under federal antitrust law.

20.    The Court has personal jurisdiction over Hudl and venue is proper in this District under 15 U.S.C. §§ 22, 25 and 28 U.S.C. § 1391, because Hudl transacts

business and is found within this District.  Hudl transacts business throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

### A.      High School and College Sports

21.    Participation in high school sports has skyrocketed.  In the 2024-2025 school year, more than eight million students participated in high school sports—an all-time record.

22.    The sports offered in high schools span the spectrum, including football, basketball, hockey, volleyball, soccer, tennis, water polo, wrestling, lacrosse, and more.

23.    More than 1,000,000 students participate in high school football alone:

| TEN MOST POPULAR BOYS PROGRAMS | | | | | |
|---|---|---|---|---|---|
| | **Schools** | | | **Participants** | |
| 1. | Basketball | 18,690 | 1. | Football – 11-Player | 1,029,588 |
| 2. | Track and Field – Outdoor | 17,390 | 2. | Track and Field – Outdoor | 644,235 |
| 3. | Baseball | 16,110 | 3. | Basketball | 540,704 |
| 4. | Cross Country | 16,091 | 4. | Soccer | 484,908 |
| 5. | Football – 11-Player | 14,269 | 5. | Baseball | 472,598 |
| 6. | Golf | 14,023 | 6. | Wrestling | 300,214 |
| 7. | Soccer | 12,969 | 7. | Cross Country | 241,565 |
| 8. | Wrestling | 11,526 | 8. | Golf | 162,357 |
| 9. | Tennis | 10,373 | 9. | Tennis | 158,667 |
| 10. | Swimming & Diving | 8,105 | 10. | Swimming & Diving | 119,102 |

24. There are over 25,000 high schools across the United States, with the National Federation of High School Associations (also known as the NFHS), serving approximately 20,000 high schools with sanctioned sports programs.

25. High school sports have historically presented fierce competition. For decades, schools have competed intensely for conference titles and state championships.

26. Beyond the competition inherent in sports, high students stand to gain admission at colleges and earn significant scholarships based on their performance. Indeed, Division I and II schools award $2.7 billion in athletic scholarships annually to over 150,000 athletes.

27. Coaches likewise build reputations and career opportunities based on performance, schools attract students through strong athletic traditions, and communities invest deeply—financially and emotionally—in the success of their local teams.

28. This level of competition has only been cemented with the emergence of name, image, and likeness ("NIL") deals for athletes across the country.

29. At much of the college level, the competitive landscape is similar. The National Collegiate Athletic Association ("NCAA") oversees about 1,100 schools across three divisions: Division I, Division II, and Division III.

30.    DI represents the highest level of intercollegiate athletics, often approaching the competition, preparation, and investment seen at the professional level.  As the NCAA explains, DI schools offer "unmatched academic and athletic opportunities."  There are about 350 DI schools across fifty states, and these schools typically have the largest student bodies, athletic budgets, and athletic scholarship funds.  The vast majority of pro athletes come from DI.

31.    DII schools offer what has been coined a "Life in the Balance" model, meaning (as the NCAA puts it) that "student-athletes are encouraged to excel not only in athletics, but also in academics, personal growth[,] and community involvement."  DII institutions typically offer only a partial athletic scholarship model.  There are about 300 DII schools.

32.    DIII schools do not offer—and are not permitted to offer—athletic scholarships.  DIII is the largest NCAA division and is home to about 430 schools. DII and DIII schools typically place a greater focus on academics over sports.  They also have substantially lower budgets than DI schools and do not participate in Football Bowl Subdivision ("FBS") and Football Championship Subdivision ("FCS") playoffs.

33.    Beyond the NCAA, there is also the National Association of Intercollegiate Athletes ("NAIA") and the National Junior College Athletic Association ("NJCAA").  The NAIA is composed of about 235 schools—mostly

11

private, smaller four-year colleges. The NJCAA is composed of about 525 two-year community colleges. These schools often provide a pathway to competing at the NCAA level.

34. While school sports may vary depending on the level, they each present a competitive environment in which teams are looking for an advantage to win. Indeed, today, about forty-five states allow high school students to monetize their name, image, and likeness—at least to some extent. And all states now allow collegiate athletes to enter NIL deals. Some athletes stand to make millions in NIL. In light of this competitive landscape, these schools, along with their athletic directors and other sports personnel, regularly look for multi-sport solutions to help prepare teams and give them an edge over competitors.

**B.      The Sports Video Analysis Industry and Hudl's Formation**

35. Against this backdrop, it's not hard to understand the importance of capturing, storing, analyzing, and exchanging game film—that is, of having a sports video analysis platform.

36. Initially, most software was geared only toward internal team usage, not sharing with opponents. After a game, schools would digitize their game film and edit it with software to more efficiently provide players with study tape—initially on DVDs and then online.

37.    In these early stages of sports film analysis, a single game could take hours to process and file formats were often non-compatible or easily corrupted, adding layers of time and trouble-shooting.

38.    In the early 2000s, the modern market for sports video analysis platforms came into being.  At that point, companies began developing web- and cloud-based platforms that allow teams to analyze and share game film.

39.    Hudl was founded in 2006.  Hudl initially focused on simplifying video management by allowing coaches and players to easily upload, share, and annotate game and practice footage.

40.    Hudl was among the first platforms to use cloud-based technology to make game and practice film available online for faster access and easier use.  From the beginning, Hudl marketed itself to high school and college teams.

41.    In 2008, Hudl launched a pilot program with twelve high schools in Nebraska, Kansas, and Texas. By 2009, the number of participating high schools had grown to 350 and Hudl expanded its services beyond football to include volleyball, basketball, lacrosse, wrestling, and track and field.  By 2012, Hudl had 8,000 high schools and colleges.

42.    This technology transformed coaching.  As one coach explained, recognizing the "competitive advantage" afforded by online film exchange, "[w]hen you see teams developing a preparation strategy quicker and more efficiently, you

13

have no choice but to change." By 2010, this software was the norm at high schools and colleges across the country.

43.    In the beginning, the market was competitive—with Hudl, DSV, APEX, XOS, and others broadly competing for schools. For example, in the early 2010s, Hudl had about 3,500 high schools and worked with some colleges, DSV had over 3,000 high schools along with a number of college clients, and APEX had approximately 1,600 high schools and colleges.

44.    But over time, Hudl came to monopolize the market.

**C.    Hudl Unlawfully Acquires and Maintains Monopoly Power**

45.    Hudl has engaged in an anticompetitive scheme to substantially foreclose competition and acquire and maintain monopoly power in the market for sports video analysis platforms throughout the United States. As set out below, Hudl's business practices are geared towards locking in customers and locking out competitors. In the words of Hudl's COO in 2011, "the desire to dominate guides every decision." To start, rather than compete on the merits, Hudl controlled the market by acquiring its primary competitors and rolling up the market.

46.    Once it obtained monopoly power by picking off its competition, Hudl foreclosed future competition by restricting the ability of customers to share film across platforms—effectively locking in schools and their athletic departments to

Hudl's service and limiting the ability of competitors to enter and expand in the market.

47.    Beyond erecting these technological barriers, Hudl further entered exclusive partnerships with state and conference athletic associations geared towards shutting competitors out.  It also prevented its competitors from appearing at the largest trade shows in the industry—trade shows that it has acknowledged are critical for client acquisition.

48.    Hudl has also employed exclusionary pricing and bundling strategies to cut off competition.  For example, Hudl often charges its customers *more* if the customer wants to use it for *fewer* sports, deterring schools from using a rival platform for some sports.  Hudl has also provided substantial kickbacks to schools who use both Hudl's ticketing service *and* its video analysis platform, using its ticketing service to further clamp down on competition in the Relevant Market.  Hudl further designs its cameras to work only with Hudl's platform, deterring consumers who use a Hudl camera for even a single sport from using an alternative platform (requiring an additional camera) for other sports.  Each of these practices are discussed in greater detail below.

### 1.    *Hudl Acquires Its Primary Competitors*

49.    Soon after its founding, Hudl developed its mantra and strategy:  to "dominate." As Hudl's COO explained in 2011, "the desire to dominate guides every decision."

50.    Hudl turned that mantra into reality by acquiring its main competitors. In 2011, Hudl acquired DSV (Digital Sports Video), Hudl's primary competitor at the time.  With that acquisition, Hudl nearly doubled its high school customer base— from 3,500 to 6,500—and acquired one of the few companies serving the college market.

51.    As one source explained:  "Lincoln-based Hudl, a company that has made it a mantra to 'dominate,' appears poised to do precisely that in terms of market share, thanks to an acquisition announced today.  Hudl, which makes web-based video coaching and analysis tools, purchased Digital Sports Video (DSV), its primary competitor in the high school football market."

52.    And as another commentator noted after Hudl acquired DSV:  "That is a huge chunk of the market that will now be added in to the Hudl family.  This will put a lot of pressure on non-Hudl schools to make the switch over to Hudl."

53.    In the absence of an ability of users or independent third-party developers to create applications to seamlessly exchange the video (which is owned by the users) across platforms, Hudl was able to create a strong network effect by

acquiring more and more users through acquisitions of rival platforms. Competing platforms became less valuable to their users if they could not seamlessly exchange game film with the large number of users on Hudl. Hudl became more valuable in the limited sense that its users could seamlessly exchange game film with a growing number of users on that platform. More broadly though, Hudl customers did not have full control of their own game film or the ability to seamlessly exchange with users on other platforms through a league or third-party exchange application and lost the benefits of competition between platforms.

54.    In the sports video analysis platform market, the service's full value hinges on being able to seamlessly transfer film on that platform to and from other schools. When a single platform reaches a critical mass, that platform's dominance becomes entrenched—absent the ability to exchange film across platforms through the availability of a league or third-party exchange application. That is exactly what has happened with Hudl.

55.    Hudl continued its trend towards market dominance with its 2012 acquisition of APEX. APEX had approximately 1,600 high school and college customers at the time, and it represented Hudl's next largest competitor (after DSV which Hudl had already acquired).

17

56. In writing about the APEX acquisition, one news organization noted that "[f]or the second offseason in a row . . . Hudl has purchased its largest competitor" and in doing so "further solidifie[d] its already dominant position."

57. Hudl's CEO, David Graff, stated that "APEX [was] a well-respected competitor" and that "[t]his acquisition [was] another big step for Hudl."

58. According to one report, Hudl acknowledged in an unpublished internal company document that, in acquiring DSV and APEX, Hudl had captured—by 2012—at least 75% of the "available market."

59. Hudl continued its aggressive M&A activity, repeatedly acquiring horizontal competitors and companies with IP in the sports technology space, including VolleyMetrics, Ubersense, Replay Analysis, Krossover, Sportstec, Wyscout, BlueFrame, SportsContract, FastModel, Balltime, InStat, StatsBomb, and Athletic Data Innovations.

60. Since 2011, Hudl has acquired over eighteen companies. Hudl has further expanded its reach by acquiring complementary products. For example, Hudl acquired Realtrack Systems, a Spanish company specializing in wearable human performance technology in 2022, and Titan Sports, a Texas-based leader in GPS player tracking for high schools and clubs, enabling Hudl to enter the wearable GPS market. To accelerate further acquisitions, Hudl raised $120 million from Bain Capital in May 2020.

61.    Today, Hudl has captured approximately 99% of the Relevant Market. As Hudl itself has conceded, "[w]ith 99% of US high schools counting on Hudl . . . , it has a foothold in virtually every community nationwide."  Hudl has also acquired approximately 99% of the college market (outside of schools at the highest levels which are not looking for platforms in the same product market Hudl occupies).

62.    This pattern of acquiring direct competitors and other companies holding patents in sports technology reflects a deliberate strategy of eliminating competitive threats rather than outperforming them based on merit.

### 2.    *Hudl Constructs Technological Barriers to Restrict Consumers and Eliminate Competition*

63.    Having captured the Relevant Market, Hudl constructed a series of technological barriers to restrict consumer movement and deter competition.  As set out below, these barriers include (a) controlling league exchanges and creating technological barriers to prevent Hudl users from entering exchanges with non-Hudl users, (b) preventing individual Hudl users and non-Hudl users from easily transferring film with each other, and (c) rejecting access to its APIs that would facilitate seamless film transfers across Hudl and non-Hudl platforms.

### a.  Hudl Controls League Exchanges

64.    One of the primary means through which Hudl maintains its monopoly is by exerting control over—and imposing restrictive conditions on—league exchanges (also referred to as league pools).  League exchanges are centralized

systems that allow schools to efficiently share and access game film with one another. They are, in effect, libraries of game videos shared between opponents.

65. When a team participates in a Hudl league exchange, a participating coach simply uploads their game video to the platform and gains access to game film from all other opponents in the conference. This ability to seamlessly exchange film is the core infrastructure for modern game planning. Indeed, at the high school and college levels, many state associations, conferences, and leagues require their use and coaches depend on league exchanges as centralized repositories for preparation and recruiting exposure.

66. As Hudl advertises, the "time-saving benefits [of a league exchange] are a game-changer for coaching staffs, allowing them to allocate resources more efficiently and focus on strategic planning and player development."

67. What would otherwise take hours to manually transfer film to other teams takes seconds through a league exchange. Coaches are strapped for time. As Hudl has observed, a coach's "time is extraordinarily pressurized." Indeed, at the high school level, most coaches work as teachers or as professionals in addition to their coaching roles, and so they are reliant on league exchanges to bypass time-consuming manual exchange processes.

68. But Hudl has weaponized its monopoly power to control the critical league exchanges and lock in users and inhibit competition. Specifically, Hudl has

20

prevented leagues, or third parties operating on their behalf, from creating their own applications to exchange game film across platforms. Instead, Hudl requires teams to purchase a membership on Hudl to exchange film with other teams in their league that store their game film on Hudl. Hudl's conduct equally harms Hudl and non-Hudl users. Hudl prevents its users from forming exchanges with non-Hudl teams via a league or third-party application and bars non-Hudl teams from accessing its proprietary league exchanges or otherwise forming their own with Hudl users.

69. Hudl's conduct reflects its knowing degradation of the experience of its own users by blocking them from entering league exchanges with non-Hudl users, sacrificing increased functionality for its clients in favor of impeding competition. Hudl intentionally incurs a short-term sacrifice—the loss of additional revenue and profits from offering a cross-platform exchange application or licensing the APIs for the leagues or independent third-party developers to create their own cross-platform exchange application—to preserve its monopoly over the long term.

70. By conditioning access to indispensable league-wide film pool on the purchase of its own products, Hudl leverages its dominance in the Relevant Market to foreclose rival platforms from meaningfully participating in that market. With close to 100% of the Relevant Market under its control, schools have little choice but to join Hudl. Without it, they are denied access to Hudl's league exchanges which nearly all other schools rely on and which (in the absence of exchange

21

applications operated by leagues or third-party developers) they need to effectively compete on the playing fields.

71.    When a school that already pays for a competing sports video analysis platform declines to purchase a Hudl subscription, they are effectively locked out of the only available league exchange.  This means that a school that does not use Hudl must find a way to manually transfer their game film to other schools, which is burdensome, time-consuming, and has been met with strong resistance from coaches.

72.    In a competitive market, teams and leagues could choose among interoperable platforms and access league pools across any platform.  In such a market, the platform with the best features and value (from analysis to statistics to filming to customer service to pricing) would win out.  But in the market Hudl has monopolized, Hudl's restrictive practices—preventing the development of exchange applications operated by teams, leagues, or third-party developers—limits and excludes competition from rival platforms that deprive teams of choice, foreclose competing vendors, and entrench Hudl's monopoly across the entire video-analysis ecosystem.

73.    Hudl's conduct creates a competitive disadvantage for both the schools that opt to use a rival platform and for competitors themselves.  A school sports video platform that cannot provide its users with full access to their league or

conference's video pool is effectively isolated.  Moreover, a school without access to game footage from other teams in its conference faces an unmistakable competitive disadvantage.

74.    Beyond restraining its users' ability to freely exchange film with non-Hudl teams, Hudl deceives its users by advertising "open exchange services," referring to "[s]ervices provided by Hudl . . . to facilitate the open exchange, sharing, access, use, and download of [any film of public games] by and among Hudl, its Affiliates, customers, **and third parties**, including any product designated as a 'League Exchange.'"

75.    Hudl's practices impose a catch-22 that hinders competition:  teams will not adopt a rival platform unless it already offers comprehensive access to their league's video pool, yet no platform can assemble that comprehensive pool unless teams first adopt it.  By conditioning access in ways that deprive non-Hudl users of full league footage, Hudl ensures that schools considering an alternative are deterred by the diminished value of a network with incomplete content.  This isolates would-be entrants and their customers, not because of competition on the merits, but because the lack of reciprocal access makes the alternative untenable.

76.    By way of illustration, this exact issue has arisen in Wisconsin with West De Pere High School.  After piloting QwikCut, West De Pere High School switched from Hudl to QwikCut for its football video analysis and exchange needs.

23

While on Hudl, West De Pere was a part of a football league pool, the Fox River Classic Conference North Exchange Pool.

77.    After it left the platform, West De Pere wrote to Hudl requesting access to the league pool, explaining: "We (West De Pere) have made a switch away from Hudl. However, the rest of our conference still uses Hudl for the League Pool. Please advise how we need to proceed with creating an exchange-only account."

78.    Hudl refused to provide West De Pere access to the videos in the league pool unless it purchased a Hudl subscription.  As Hudl told West De Pere, looking to force the school's return to Hudl:  "We do not offer in any exchange only accounts. You would need a Hudl account . . . to access the conference exchange pool for football. The cost for a football silver account is $900/year. If you want to move, please let me know."

79.    When West De Pere High School informed QwikCut's CEO Todd DeNoyer of this situation, DeNoyer contacted Hudl's senior sales leaders, Dave Hinkens and Grant Jeffres, asking them to grant West De Pere and other non-Hudl schools access to Hudl's league pools.

80.    In discussing the lockout with Jeffres, QwikCut's DeNoyer noted that the failure to provide access would put "non-Hudl high schools at a competitive disadvantage preparing their teams to compete on the field" and stated that "it was

24

unfortunate that Hudl would rather force schools to use their services than win them over with a superior product and service."

81.     In response, Jeffres denied DeNoyer's request.  Jeffres did not disagree that Hudl's policy put QwikCut at a considerable competitive disadvantage.  Instead, he simply compared Hudl's position on the league pool to iPhones vs. Androids, explaining that Apple also prevents its users from fully interacting with people who have other devices:

> West De Pere and their coaches will still be able to be receive film from Hudl teams and send film to Hudl users– it just won't be through the exchange pool that's on Hudl. (I.e. iPhone users can still text android users and vice versa, but it looks slightly different than when texting iPhone to iPhone via iMessage.)

82.     Jeffres maintained that West De Pere would be required to pay for a Hudl membership to regain access to the Fox River Classic Conference North Exchange Pool.

83.     To ensure that West De Pere did not face a competitive disadvantage after switching to QwikCut, QwikCut ultimately paid Hudl's fee on the school's behalf, allowing it to regain access to the league pool game film for the year by paying for a Hudl membership.  However, this issue is likely to recur—with West De Pere and countless schools across the country—if Hudl's anticompetitive conduct continues.  QwikCut cannot meaningfully compete in a world in which it is required to pay for its clients to use a competitor's platform.

b. Hudl's Practices Make Direct Video Sharing Difficult or Impossible

84.    Beyond constructing technological barriers at the league level, Hudl further renders it difficult or impossible to exchange film individually between Hudl and non-Hudl users—particularly at the high school level.

85.    Within Hudl, users can exchange film with one another seamlessly—within seconds and within a few clicks of the buttons.  But Hudl has made it impractical to initiate Hudl to non-Hudl *or* non-Hudl to Hudl exchanges.

86.    Starting with a film transfer from a Hudl user to a non-Hudl user, the exchange process takes several steps.  First, the non-Hudl school coach must individually request game film from each Hudl school coach via text message, email, or a phone call.  With frequent coaching turnover, obtaining contact information is a significant obstacle.

87.    Second, after the non-Hudl team requests film, the Hudl coach must then log into Hudl and manually select and download the game film they would like to share.  It routinely takes *hours* for the film to download.

88.    Third, the Hudl user then receives an email with a link to the downloaded files.  The Hudl user then forwards that link to the non-Hudl user.

89.    Fourth, the non-Hudl user then receives the link and must download the file into the platform they use.  For sports like football, where each play is a separate video file, Hudl has designed a significant intercut problem.  In such sports, there

26

will often be a different number of plays with each camera angle due to testing, outage, and various other factors. For example, if one camera runs two test shots throughout a game, one camera angle may have 150 clips while another has 148 clips. Analysis platforms rely on blank .mp4 placeholders to account for differences in shot counts and allow the camera angles to align for each play. But when a Hudl user transfers film to a non-Hudl user, Hudl removes those placeholders, forcing non-Hudl users to manually identify where placeholders are missing, rearrange the files, and match film.

90. QwikCut does everything it can to facilitate Hudl to QwikCut transfers. For example, QwikCut eliminates the time it would take for QwikCut users to manually download and extract Hudl film from the .zip files housed in the transfer links by allowing users to simply copy and paste Hudl's link into the QwikCut platform. The QwikCut platform automatically extracts the film from the link and .zip files and uploads the film (including all camera angles) to the QwikCut platform. Even still, Hudl to QwikCut exchanges require identifying coaches, requesting film, downloading and emailing film, and then resolving any intercut issues.

91. Hudl has imposed similar obstacles when it comes to film exchanges from non-Hudl users (like QwikCut users) to Hudl users. First, as with Hudl to non-Hudl exchanges, the Hudl user must first request game film over phone, text, or email.

27

92. Second, once a Hudl coach requests film, QwikCut allows its users to download the requested film and send that film to the Hudl team.

93. Third, unlike QwikCut, once a Hudl user receives the game film, Hudl does not provide an option for users to copy and paste that link into their platform. Instead, Hudl users must manually (1) download the .zip files with the film, (2) extract the files from the .zip file, and (3) upload the film to the Hudl platform. Even in uploading film to the Hudl platform, Hudl makes the process extremely cumbersome. Although QwikCut provides the files with placeholders (eliminating any intercut issues), Hudl requires users to upload *each* camera angle separately— rather than uploading each angle automatically as QwikCut allows its users to do.

94. While QwikCut has made this process as seamless as possible, the cross-platform film exchange process is difficult, unreliable, and results in schools choosing Hudl to avoid the technological challenges Hudl has created. Hudl is aware that school sports coaches are short on time and often lack the technological capabilities to facilitate burdensome exchanges. Thus, Hudl has unnecessarily complicated the film exchange process by failing to allow users to transfer their own game video files in an interoperable format or allow third-party developers to provide exchange applications for cross-platform exchanges.

95. While Hudl advertises to customers that users can easily transfer video to non-Hudl teams, it fails to disclose that Hudl creates intercut problems, requires

28

its users to upload camera angles from non-Hudl schools separately, and takes hours to transfer film across platforms.

96.    These technological barriers are not a necessary feature of the sports video analysis platform market but rather an unnecessary means of maintaining Hudl's monopoly power through anticompetitive means.

97.    When it comes to colleges (a much smaller segment of the market), some of these challenges appear to have been *somewhat* ameliorated. In 2007, the major sports video analysis companies at the collegiate level, including Catapult and DV Sport established a third-party non-profit organization, the Sports Video Interoperability Group.

98.    The Sports Video Interoperability Group builds and licenses technology standards to enable data exchange between sports video products. As the Group explains on its website, "The Sports Video Interoperability Group is guided by its membership to develop standards that allow video and metadata to be used across different applications." The Group relies on .mp4 and a proprietary .xchange file format which it licenses to member organizations. This standardized format facilitates video exchanges between collegiate programs.

99.    Hudl, which is a small player in the college sports video analysis and exchange market, joined the Sports Video Interoperability Group in 2014. For Hudl users at the college level, Hudl allows teams to send and receive .xchange files to

29

facilitate cross-platform exchanges.  A screenshot of Hudl's college platform shows that Hudl provides the Xchange download format to make it "easy to import into XOS and DVSport," which also offer platforms at the college level.



100.   But at the high school level, Hudl has removed this option—preventing high school teams from sending or receiving .xchange files that would facilitate transfers between platforms.

101.   The reason for this difference is obvious.  At the college level, Hudl is not the dominant sports video analysis platform.  At the DI level in particular, many teams turn to sophisticated sports video analysis platforms like Catapult, DV Sport, and XOS.  Given its relatively small presence at the D1 level, Hudl has no choice but to "play ball" by providing the data files for easier interoperability.  Hudl's customer base, mainly smaller schools, often face off against DI programs—and

30

those games can draw significant revenue for smaller programs. Hudl needs to offer the .xchange files in light of these pressures. At the high school level, however, Hudl has captured a near-complete monopoly and has refused to facilitate the same level of disclosure to third parties.

102. Even at the college level, however, using an .xchange format is significantly more burdensome than Hudl's intra-platform exchanges. The .xchange file system originated at the height of big-budget major college football where many teams use physical servers rather than cloud-based platforms for video analysis. Given Hudl's cloud-based software, Hudl could allow users or developers, for example, to develop third-party exchange applications for use with platforms in the Relevant Market. But it has (and will) not.

### c. Hudl Refuses to Provide API Access

103. Application Programming Interfaces ("APIs") are sets of rules that allow different software systems to communicate with one another. APIs essentially serve as intermediaries, allowing users to seamlessly move data or information across platforms.

104. APIs are prevalent across the web and are a customary means to establish compatibility between different applications, websites, or platforms. Indeed, in competitive technology markets, firms commonly publish APIs so that customers can migrate or operate seamlessly across platforms. Creating APIs to

31

facilitate communication across platforms is simple and can be accomplished within hours.

105.    In 2018, for example, Microsoft, Google, Twitter, and Facebook announced the Data Transfer Project (now called the Data Transfer Initiative), an API-driven initiative to make it easier for users to move their data between those services.  The initiative allows users to, by way of example, move photos or videos permanently across services or move social media history across platforms so that users do not have to start from scratch.

106.    In the medical industry, providers use APIs to allow patients to seamlessly transfer data across other medical providers.  In the cloud industry, companies like AWS, Microsoft Azure, and Google Cloud publish APIs which allow consumers and third parties to synchronize data across clouds and deploy applications that work in multiple clouds.  And in the banking industry, competing banks use APIs to connect to automated clearing houses to allow customers to seamlessly transfer funds between different banks.

107.    APIs also enable developers (or customers) to develop third-party tools that integrate with an existing program and add new features, further enhancing an existing product.  Websites like Microsoft and X (formerly Twitter) publish APIs to facilitate this exchange.  While many companies publish their APIs for free because of the advantages they reap relating to third-party development, some companies

32

(like X) also charge for access to at least a portion of their APIs.  X, for example, provides some APIs for free, charges $200 per month for another API package, and charges $5,000 per month for its pro API package.

108.   When a dominant platform makes its APIs available, rival products can connect to the incumbent's system, and users can adopt innovative tools without losing access to shared data. But when a monopolist withholds APIs, it can prevent rivals from accessing essential data and block users from using competing services, even when those competitors offer better or lower-cost solutions.  That is exactly what has happened here.

109.   Hudl has refused to provide the necessary access to its APIs that would enable communication between its platform and others.  With access to an API, leagues could create their own league exchanges or use a third-party exchange application to do so.  A Hudl user and a QwikCut user, for instance, could both participate in the same league pool—each from a third-party exchange application available on both platforms.  An API would also facilitate the seamless individual team exchanges that occur within the Hudl app.  Just as a Hudl user can transfer film to another Hudl user within clicks, a Hudl user would be able to do the same with a non-Hudl user.  This, again, could function through an independent third-party developer allowing seamless exchanges across various sports video analysis platforms.

33

110. Hudl could easily provide access to its internal APIs or technical documentation necessary for teams, leagues, and independent third-party developers to facilitate shared league exchanges or cross-platform exchanges. Access to Hudl's APIs would allow Hudl users to seamlessly share film with new teams across platforms; spur innovation by third-party developers; and allow for add-ons relating to statistics, grading, sports technology, and data analysis. That innovation could include, for example, AI-driven coaching tools, highlight reel generators, and compatibility with wearable technology. Hudl could generate additional revenues and profits by making these APIs available. But Hudl has declined to do so, sacrificing these potential gains (both for itself and its users) to reinforce its monopoly in the Relevant Market. In doing so, Hudl constrains user choice and crushes innovation that might help crack the wall surrounding Hudl's monopoly.

111. Hudl also has a history of allowing API access when it has served the company's strategic interests. As an example, Hudl had a previous partnership with MaxPreps, a sports statistics website. As part of that partnership, all videos marked as highlights on a team's Hudl account were sent to its MaxPreps team page. Further, when coaches entered rosters and game statistics into their MaxPreps accounts, they had the option to automatically sync or transfer that information to their Hudl accounts. This level of interoperability is traditionally accomplished through APIs to facilitate syncing between platforms.

34

112. Yet Hudl has rebuffed QwikCut's attempts to obtain access to Hudl's existing APIs to facilitate the seamless sharing of game videos between platforms so that teams could freely exchange between the two platforms.

113. For instance, in October 2025, DeNoyer (QwikCut's CEO) wrote to Jeffres (Hudl sales executive) about West De Pere's inability to exchange film with Hudl teams since moving to QwikCut, suggesting that Hudl should make an API available to allow its customers to easily exchange film with non-Hudl users:

> Hopefully, in the near future, an API can be built so that Qwikcut schools can access the league pool, and Hudl schools can access everyone's games. There needs to be a solution for the league pool that allows schools to access it without paying for a Hudl account. I am available for a discussion about an API solution.

114. In response, Jeffres stated that he would share the request internally and admitted that an "API call-out may be a good one." However, Jeffres has failed to respond further, effectively rejecting QwikCut's request.

115. By withholding API access to anyone, including the teams, leagues, and third-party developers, Hudl prevents its customers from easily transferring their video and metadata to competing platforms like QwikCut or from sharing their video footage with QwikCut or other non-Hudl users.

116. Hudl's refusal to support cross-platform video sharing magnifies the exclusionary impact of its control of league pools. Without the ability to obtain game video through league pools and in the absence of a viable alternative

mechanism to exchange video across platforms, non-Hudl users are effectively foreclosed from obtaining essential video content necessary to compete. This compels schools to either remain on Hudl's platform or adopt the platform, thus magnifying the anticompetitive effects in the market.

117. To be clear, Hudl is restricting the ability of *customers* to use the *customer's* own game film and would not be doing so in a competitive market. Hudl does not need to deal with a competing platform to free up customers in the market because customers could turn to the leagues or independent third parties for a cross-platform exchange application if Hudl were simply willing to cooperate with the leagues or independent third parties. Nor does Hudl have to deal with a competing cross-platform exchange application because Hudl has chosen not to offer one. Hudl is restricting *customer* access to necessary information about the *customer's* own game film to stymy the *customer's* ability to exchange that game film freely and lock the *customer* into the Hudl platform indefinitely. Hudl would not be doing so if it did not have a monopoly.

118. Hudl is consciously sacrificing short-term profits to preserve its monopoly. By making its APIs available to developers and consumers, Hudl would improve its own product and increase its own profits. In particular, developers would develop features and applications that improve Hudl's platform and the user experience. Hudl could also charge developers, users, or conferences and leagues

36

for cross-platform exchanges or the APIs to enable such exchanges. But Hudl has chosen to forego these revenue and profit sources so that it can maintain its monopoly. Hudl's intent in doing so is clear: to maintain and reinforce its longstanding monopoly in the market. There is no legitimate business reason for Hudl's actions, which are solely motivated by its goal to preserve its monopoly in the Relevant Market.

119. Hudl's conduct is also anticompetitive and unlawful because APIs are an essential facility. Without access to Hudl's APIs it is impossible for third-party developers, consumers, or competitors alike to create a cross-platform league exchange. Given Hudl's near-complete control of the market, a cross-platform exchange is necessary to compete. Although Hudl could easily provide API access at little or no cost to facilitate seamless exchanges across platforms, Hudl has refused to do so. In the end, by constructing technological barriers, Hudl restricts developers and consumers—contrary to its own short-term interests—to preclude competition over the long-term.

### 3. *Hudl Maintains its Monopoly Power Through Exclusive Agreements*

120. In addition to the league exchange lockout, the issues with direct sharing, and its refusal to allow API access, Hudl has maintained and strengthened its monopoly power through a deliberate and consistent strategy of entering

37

exclusive partnerships which hinder competition in the Relevant Market. For example, Hudl has secured exclusive partnerships with numerous athletic associations and entered into exclusive agreements that prevent its competitors from marketing their platforms to coaches at key coaching clinics.

121. Hudl has entered partnerships with numerous statewide athletic associations, as well as private, independent, and other athletic conferences across the United States. To illustrate, Hudl has exclusive partnerships with the following statewide athletic associations: Oregon (the Oregon School Activities Association), Indiana (the Indiana High School Athletic Association), Michigan (the Michigan High School Athletic Association), and Nebraska (the Nebraska School Activities Association).

122. Hudl has also entered partnerships with the NAIA and NJCAA—the two major collegiate athletic associations outside of the NCAA. In particular, the NAIA has partnered with Hudl "as the NAIA's Trusted Service Provider in Video Analysis, Video Exchange, and Auto Capture Solution." The same is true for the NJCAA, which "announced a partnership renewal with Hudl to continue as the Official Video Analysis, Exclusive League Exchange, and Official Automated Capture Solution of the association."

123. Hudl has also entered into exclusive partnerships with various independent school and other associations, including the North Carolina

38

Independent Schools Athletic Association, Western Pennsylvania Interscholastic Athletic League, Texas Christian Athletic League, Virginia Independent Schools Athletic Association, Ohio Soccer Association, New Jersey Youth Soccer Association, New York West Soccer Association, Kentucky Youth Soccer Association, Connecticut Junior Soccer Association, the Pennsylvania State Athletic Conference, the Northwest Athletic Conference, and Conference Carolinas. These exclusive partnerships span the high school and college ranks.

124. While the partnerships can vary in their exact terms, the exclusive partnerships further cement Hudl's dominance and prevent newcomers from breaking ground. For example, in some instances, Hudl offers its platform for free, below cost, for a period of time to entice teams in an athletic association to join Hudl. Other partnerships require teams to use Hudl for video exchanges during the playoffs—deterring teams from doubling up on platforms. Some associations, like the Iowa High School Athletic Association, require Hudl uploads throughout the season in their association rulebooks or manuals.

125. Hudl has also leveraged its market power to secure exclusive contracts with two of the largest football coaching clinics in the country: Glazier Clinics and the Nike Coach of the Year Football Clinics. As recently as 2024, Hudl excluded its competitors from those clinics.

126.    These are key events in the industry for connecting football coaches and introducing them to new technologies.  As Hudl's founder and CEO agreed, these events are critical for selling the product in this space:  "So this isn't the situation where you could just buy some Google ads and then have all your customers come in.  No, you need to exhibit it.  You need to go and shake hands and show it off and let people grab the mouse away from you."

127.    Because of these exclusive contracts, competitors such as QwikCut and others who offer competing products could not attend these clinics for years.  They could not exhibit their products and allow coaches to grab the mouse.  Glazier often holds twenty plus in-person clinics each year.  Similarly, the Nike Coach of the Year Football Clinics are very respected and well attended.  In 2025, Nike held clinics in six cities.  Each of these clinics represents a missed opportunity for QwikCut to market its platform to coaches and athletic directors.

        4.    *Hudl Engages in Exclusionary Pricing and Bundling Practices to Hinder Competition*

128.    Beyond rolling up competitors and acquiring IP, fortifying technological barriers around its monopoly, and entering exclusive agreements with conferences and clinics, Hudl also engages in various pricing practices that hinder competition on the merits.

129.    For example, Hudl often *increases* its prices for customers who want to use the Hudl platform for *fewer* sports.  In other words, Hudl charges more for less.

This reverse quantity discount (or non-monotonic pricing) is used to lock in customers and foreclose competition.  Hudl is able to use its monopoly power to impose this pricing structure to penalize schools that attempt to adopt a rival platform for one or two sports by eliminating cost savings that would otherwise result from partial switching.

130.   Hudl's charge-more-for-less pricing cannot be justified by cost savings, as servicing fewer sports reduces Hudl's costs rather than increasing them.  Instead, the pricing scheme functions as a partial exclusivity mechanism that conditions pricing on department-wide adoption.  In doing so, Hudl preserves its monopoly power not through competition on quality or price but through exclusionary conduct that locks customers into its ecosystem by penalizing them for partially adopting another platform.

131.   Hudl engages in other bundling tactics intended to bind customers to its sports video analysis platform.  By way of example, in 2023, the New Jersey Super Football Conference approved QwikCut to become a second approved vendor (along with Hudl).  Soon after, Hudl started offering teams who bundled Hudl's ticketing services (which allow schools to sell sports tickets to parents and fans) with Hudl's sports video analysis platform.  Specifically, Hudl offered those schools $5,000 to bundle ticketing services with video capture, storage, analysis, services—a massive

bundled discount that can only be explained by Hudl's desire to kill competition anywhere it exists. Unsurprisingly, in New Jersey, schools quickly returned to Hudl.

132. Or consider another example. Hudl offers cameras which are the "only camera that uploads automatically to Hudl." These cameras fully integrate only with the Hudl platform, allowing (for example) automatic uploads to Hudl but not to other platforms. It generally does not make sense for schools to purchase, maintain, and house multiple cameras. As a result, Hudl can use its power in one sport to hold hostage an entire athletic department. In other words, once Hudl gets a toehold in a single sport, Hudl can capture the entire athletic department—not by offering a superior product across sports—but by locking customers in through exclusionary practices.

133. And that, in the end, is Hudl's M.O. Hudl has written—and carried out—an entire playbook of anticompetitive conduct, geared towards locking in consumers and locking out competitors. As Hudl's own COO put it, Hudl's "desire to dominate guides every decision." From rolling up competitors to entering exclusive conference agreements to excluding competitors from trade shows to prohibiting consumers from freely transferring video and data to engaging in otherwise irrational pricing practices, Hudl's COO is exactly right.

42

### D.   Anticompetitive Effects

134.   In unlawfully acquiring and maintaining a monopoly, Hudl has harmed consumers by imposing supracompetitive prices, offering inferior service, and restricting consumer choice.

#### 1.   *Hudl Charges Supracompetitive Prices*

135.   Hudl has exploited its monopoly power by charging supracompetitive prices for its product.  At one point, Hudl charged as little as $99 annually per team and gave teams unlimited storage, allowing them to save all historical games.  That pricing rapidly increased from $99 to $400 per team.  Over time, Hudl's prices have continued to skyrocket.

136.   Today, Hudl's silver package (its base package) is $900 for the first team and then $750 for each additional team.  Hudl's gold package (its intermediate package) is $1,600 and $1,200 for each additional team.  And Hudl's platinum package (its premium package) reaches $3,300 for the first team and $2,200 for each additional team.  And each of these options impose restrictive data limitations.  Hudl has had three significant price increases in four years.

137.   But those packages lack many of the features that draw schools to sports video analysis platforms—such as highlight tools, recruiting profiles, and instant replay capabilities.   Schools need to purchase Hudl's "Athletic Department Package" to obtain these features.  But shrouding its pricing in secrecy, Hudl does

not publicly disclose its AD Package pricing.  Reports indicate that schools regularly pay more than $10,000 annually for the package.  Some schools pay as much as $29,000 annually.

138.  Coaches across the country have repeatedly cited these price increases, often noting that Hudl has become borderline unaffordable but that schools have no choice but to join Hudl:





139.  Hudl's prices often double competitor pricing.  QwikCut, for example, charges $450 per season for football and $300 for all other sports teams—less than half Hudl's rate for a substantially similar product.  QwikCut also allows users to store all footage without storage caps.  PlayOn (another sports video analysis platform), for its part, offers video analysis and exchange services for *no charge* for

schools that stream with the NFHS Network, and offers advanced services for $600 (less than Hudl's base package).

140.   Beyond inflating its prices, Hudl is able to discriminate in its pricing by concealing actual prices for its full bundle of services and charging more—not less— for its platform if the customer wants to use it for fewer sports.   These pricing practices are not indicative of a healthy or competitive market.

141.   Nor does Hudl benefit from its monopoly only in the price of its sports video analysis platform.  Hudl requires its customers to grant it a license to film on the Hudl platform.  Hudl uses that license to sell a separate recruiting platform to colleges and professional sports teams.  That platform allows teams to analyze players (e.g., a college team can view players' high school tapes).  Because Hudl has a monopoly on the market, it generates substantial profits—not just from selling its sports video analysis platform—but also from its control over recruiting film.

142.   Hudl's price increases far exceed inflation and cannot be explained by increased capabilities or normal market forces.  Instead, Hudl's price increases reflect that it has monopolized the market and can—and does—charge monopolist rates.

### 2.    *Hudl Offers Degraded Services and Hinders Innovation*

143.  Beyond charging supracompetitive prices, Hudl has (without competitive pressures) degraded its services.  To start, in 2019, Hudl decided to

impose storage restrictions on its users *despite* increasing its prices.  Like its few competitors, Hudl had previously provided unlimited storage.

144.  Hudl users immediately reacted to these storage restrictions—which required them to delete games they could historically maintain on their Hudl accounts:



145.  As others commented in the wake of Hudl's storage restrictions:

    a.  "[W]hen you are a monopoly you can do whatever you want...  We need to all look at alternatives and see how we can all find another option..."

    b.  "But it is absolutely the effect of their policies to grab as much cash as they think the (presently inelastic) market will bear.  And the reason they are doing it now is because they think they can—they have run all the major competitors out of the market, and they believe they have a sticky enough product that most customers don't want to go through the hassle and risk of changing.  And they are probably right, at least in the short term."

    c.  "[N]ot a good look for Hudl, but does it matter if you don't have any competition?"

    d.  "[T]hey are trying to extract as much money from the game as possible and they made the conscious decision that this was the best way to do it. And until a competitor shows up, they are probably right."

146. Despite facing these storage restrictions, Hudl users had no feasible alternatives due to Hudl's technological barriers on cross-platform film transfer. Several coaches explained this issue. As one explained, "[i]f other teams on your schedule are using Hudl and thats where you're exchanging your film, and you decide to go with another program, you'll still be able to exchange film," but you will face "exchange issues."

147. Or as another coach presciently explained, "***The real thing that is going to keep HUDL in a monopoly is needing it to trade*** . . . . HUDL can then monopolize this by saying simply that their server cannot accept non HUDL trades or downloads and they can program it that way. So we are back to DVD uploads and all of the convenience of one click and your film is there is gone. ***You don't need a competitor you need someone to push them to the brink of losing their business and forcing them to accept cross system trades***."

148. These storage difficulties have, according to users, worsened over time with Hudl footage absorbing more storage. As one user put it, "The Hudl storage scam is something else. With so many teams moving to 'HUDL' cameras, game/scout film is twice as long now time wise." Yet again, because of Hudl's exchange restrictions, its users have no meaningful alternative.

149. In addition to restricting storage, Hudl has fallen off when it comes to customer service and maintaining its product. As one football administrator

47

explained, various Hudl features have become outdated with Hudl lacking any incentive to keep up:



150. Indeed, coaches across the country repeatedly note Hudl's lack of customer support:



151. Another user put it pointedly: "There's no reason for them to fix anything. They have zero competition."

48

152. Just as it has little incentive to maintain its product and offer quality customer support, Hudl likewise has little incentive to innovate. Customers have observed and criticized this fact over and over again, noting (for example): "[t]hey essentially have a monopoly on highschool football film technology and have zero motivation to innovate" and "[i]t's a clunky software overall but they have a monopoly over the category."

### 3. Hudl Artificially Restricts Consumer Choice

153. Hudl's anticompetitive scheme—and its anticompetitive effects—may be most apparent from the way in which consumers explicitly acknowledge that they are trapped within Hudl's overpriced and underserved platform as a result of Hudl's conduct.

154. Hudl customers routinely acknowledge that they would prefer to leave Hudl but that they have no choice but to remain with Hudl—not because it's a better product—but because Hudl restricts cross-platform exchanges.

155. Hudl's conduct forces users to remain with the company not because of the superiority of its product but because of the barriers associated with switching platforms.

156. Over and over again, coaches have indicated that Hudl's exchange barriers are dispositive and that they would switch from Hudl to QwikCut but for Hudl's decision to prohibit manageable exchanges across platforms:

**Email to QwikCut Dated February 2025**

Todd, I appreciate the trial with Qwik cut and I appreciate you answering questions. At this time we are going to stick with Hudl-- I like what you guys are doing, but I can't be the trailblazer on this... The exchange process is the hang up-- not just football, but with basketball as well-- I know our coaches will struggle to get exchange games as they aren't great on computers and I have to do most stuff for them on hudl outside of turning their computers on. There are a lot of things in Qwik Cut that I wish Hudl had, you have a quality product, but the decision is a whole athletic program decision, not football only unfortunately. I wanted to let you know ASAP so you can focus your manpower on those you are more likely to convert. Thanks again for your time and the trial.

**Email to QwikCut Dated July 2022**

After going back and forth my new headmaster and board we're are going to sign back up for Qwikcut for football this year. Unfortunately my basketball coaches want to use Hudl because the ease of trading films with multiple teams in a week, which is required for basketball.

Your company's customer service was extrodinary last year and I'm looking forward to continuing with you this year. Please send me a contract so I can sign. I do need the invoice to be billed for Aug 31 if that is okay because we're not doing our football fundraiser until Aug 20.

**Email to QwikCut Dated February 2021**

I am interested. keep going back and forth on the whole thing.

The trading of films and the simplicity of hudl with our region and non region coaches is a big hang up for me.

157.    As another school explained, "the easy exchange with other teams via Hudl is . . . indispensable" and Hudl's cross-platform exchange barriers were dispositive in sticking with Hudl's services over QwikCut.    In other words, customers repeatedly explain that they do not like Hudl and desperately want to shift

50

away from Hudl but they are trapped as a result of Hudl's anticompetitive conduct.

QwikCut has repeatedly heard this same refrain from consumers:

    a.  "Going back to HUDL because of exchange. Loved the platform."

    b.  "Thinking they may go back [to] hudl bc of the ease of use. Ran into a lot of trouble with swapping film-doesnt [sic] know what they are going to do."

    c.  "[S]tayed with Hudl bc of ease of exchange[.]"

    d.  "My league has a mandatory HUDL exchange, how would switching to QwikCut impact our ability to participate in the league pool? If this is prohibitive, then I'd rather know up front, otherwise I'd be interested in our options."

    e.  "[W]ent back to [H]udl because of exchange wit[h] basketball coaches[.]"

    f.  "Can you tell me if this works with hudl? If a conference and state is using hudl already does every school need to be on board to exchange film and have all teams using both hudl and yours connected in a library? I don't see how this could work if the entire state uses hudl in MN?"

158. Consumers, innovation, and the competitive process—not Hudl alone—should decide what options consumers should have. While Hudl is premised on film exchange to allow teams to compete at the highest level, Hudl restricts that exchange to avoid competition in the market. Rather than take its competitors head on and compete on the merits, Hudl distorts the competitive process and exploits its monopoly power to avoid competition.

51

159.    As it now has the "monopoly playbook," Hudl has every incentive to continue and expand its exclusionary practices in the future to continue to lock more schools into using its platform just to compete.

### E.    Hudl Has No Procompetitive Justification for its Anticompetitive Conduct

160.    There are no valid, procompetitive benefits of Hudl's exclusionary conduct that would outweigh its anticompetitive effects.  Hudl's conduct has not resulted in lower prices, higher output, improved innovation, or a better user experience for users.

161.    By way of example, there is no procompetitive justification for barring users from transferring film across platforms.  Promoting cross-platform exchanges would promote user capabilities, expand the base of consumers that can interact with the software, and promote competition on the merits in the market.

162.    Similarly, there are no procompetitive justifications sufficient to explain denying third-party developers access to APIs.  Access would promote consumer choice, provide free R&D for new capabilities, and expand Hudl's features.  Hudl has sacrificed the benefits it could obtain by allowing free exchange through APIs to maintain its monopoly in the market.

163. Hudl cannot demonstrate procompetitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

164. Hudl cannot demonstrate that entry into the Relevant Market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

165. Hudl's unlawful conduct eliminated competition in the Relevant Market and deprived consumers of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

## F.     Relevant Market

166. The relevant product market is the market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, and exchanging sports video and data for school sports programs and athletic departments.  These platforms provide tools for capturing, uploading, storing, organizing, tagging, analyzing, and exchanging game film and associated metadata (e.g., play tags, down-and-distance, and angle synchronization) among teams, conferences, and state associations.  These coaching toolkits are designed to meet the needs of school sports programs like football, basketball, and volleyball. The services include analyzing film through tagging, playlists, annotation, drawing, and similar features; exchanging film with other teams; sharing film through

53

highlights or with recruiting staff; organizing and storing the film, normally through the cloud; and breaking down film statistically.  Recently, capturing film through AI cameras and other hardware has become a part of the suite.

167.   Hudl repeatedly describes its product in just this way.  On its website, for example, Hudl says:  "Hudl is a global leader in sports technology. We change the way people see sports, with advanced hardware and software that capture, analyze, organize and distribute data and film."  Hudl similarly describes itself on its About Us page as "changing the way teams around the world capture, organize, analyze and learn from film and data."  Hudl explains that it offers "[o]ne platform to help the whole team improve" by "record[ing] and upload[ing]," "review[ing]," "analyz[ing]," and "shar[ing]" film and stats.  And elsewhere, Hudl describes itself as "[a] complete suite of video and data products" with "smart cameras [that] capture every second of the action, and . . . software [which] makes video easy to access, analyze, share and learn from."  Hudl is, in short, "all-in-one coaching software for video and stats" across multiple sports for a "fully integrated" or "efficient, unified workflow."  As Hudl puts it, "Hudl products power the entire athletic department."

168.   David Graff, Hudl's CEO described Hudl similarly in a 2020 Forbes interview:

> A company that officially launched with a partnership with the University of Nebraska football team in 2006 for the 2007 season has since taken over sports, now with more than 160,000 teams globally using the video analytics tool, 2,200 employees across the globe and

54

98% of all high schools in the United States using the tool born in Lincoln, Nebraska.

"I still talk about videos at the core," says David Graff, a cofounder of Hudl with Brian Kaiser and John Wirtz. "We make it easy for teams to capture, catalog, share and really bring value to games, practices and opponent scout video. That hasn't changed. There is a lot we do around data, but it still all comes back to video at the core."

169. QwikCut likewise advertises its product as an "all-in-one platform" that allows schools to "capture[]," "store," "share," and "analyze game film" across multiple sports. "It's a powerful, all-in-one video platform that lets you spend less time hunting for clips and more time drawing up plans to outsmart your next opponent[.]" PlayOn likewise holds its product out as giving "affordable access to professional-grade video analysis across 11 sports," allowing teams to capture, store, analyze, organize, and share game film. These platforms provide a series of interconnected services that work together seamlessly and complementarily to form a coach's toolkit.

170. The relevant product market primarily caters to high schools and colleges outside the DI level. The relevant products offer features catering to the high school and smaller college market, such as recruiting tools, highlight editors, and a cloud-based platform allowing dozens of users to access the platform from the school or elsewhere. The relevant products contain a unique blend of features targeted to the needs of high schools and smaller colleges in a package that they can afford with their constrained budgets. Hudl has continuously raised its price without

55

schools fleeing to other platforms or services, demonstrating that the market did not consider other services or individual components of Hudl's coach's toolkit to be reasonable substitutes for the packages offered by companies like Hudl, QwikCut, and PlayOn.

171. The relevant product market does not include ultra high-end sports video analysis platforms—like Catapult or DV Sport—which are used in professional sports and at the NCAA Division I level. Such high-end platforms are qualitatively different from platforms like QwikCut or Hudl: they often run on physical servers (rather than cloud-based storage) and often require specialized laptops for security reasons; they implement stricter policies geared towards protecting team data; they are designed to accommodate various position rooms (e.g., a quarterback room or defensive line room); they offer deeper and more powerful analytics and statistics, including real-time access to videos and data on gameday; and they offer a host of features not present in the relevant product market.

172. In other words, these high-end platforms are built around sophisticated, labor-intensive analytics tools, proprietary data feeds, high-budget production systems, and multi-angle broadcast-quality footage—features that high school and small college programs neither use nor can afford. The footage quality often requires hardwire solutions—unlike the wireless setup found at the high school and smaller college level. These high-end, server-based solutions are too complex and expensive

for high schools and smaller colleges. While prices are not publicly disclosed, reports indicate that prices for Catapult can reach as much as $80,000 or more.

173. Catapult and DV Sport dominate DI and professional sports. In 2019, for example, Catapult said that it worked with all 31 National Hockey League teams. In 2021, Catapult said it was partnered with all 32 NFL teams and that more than 80% of Power 5 programs (i.e., teams in the ACC, Big Ten, Big 12, Pac-12, and SEC) trust Catapult. DV Sport has likewise stated that it has partnered with over 50 professional leagues, including at least 9 NFL teams, nearly 40 FBS teams, 62 FCS teams, NASCAR teams, and other elite programs. Programs like Hudl and QwikCut are rarely used at this upper level. Even if platforms like Catapult were priced similar to platforms like Hudl, users of one would not likely switch to the other. That is because such high-end platforms are not interchangeable with platforms in the Relevant Market. Companies like Catapult and DV Sport cannot easily create the platform, infrastructure, and business connections to serve the high school and college market (outside DI). Nor would they likely have the desire given that they have positioned themselves to serve the highest levels of sports.

174. Hudl itself views products geared towards the DI and pro levels as making up a different market. As Hudl CEO David Graff has explained, when Hudl formed in 2006, it was mostly focused on the NFL and DI market. Hudl was having limited success but "kept hearing from high schools and smaller colleges that didn't

have these type of solutions." So Hudl "made a decision . . . to start building out that software and to make a solution that would work for smaller colleges and for high schools and to do it totally online." As one report on Hudl put it, "Hudl found much interest from high school and smaller colleges and pivoted their target market."

175.   To this day, Hudl views DI and pro level products as forming a different product market. For example, on its website, Hudl distinguishes between high school and college sports (on the one side) and DI and professional sports (on the other). In particular, while Hudl offers a substantially similar suite to high schools and smaller colleges, it has a separate page with "[v]ideo and data solutions for NCAA Division I Colleges," offering base features not included at the lower levels. The same is true for professional sports—where Hudl offers a unique product called "HUDL PRO SUITE."

176.   Hudl refers to NCAA Division I and professional sports products as the "elite market." And its job descriptions are often specific to that particular market. For example, one Hudl job ad said: "We're looking for a Senior Software Engineer to join our team and work on products for our Elite North American market, which includes American football, basketball, ice hockey and soccer." Hudl regularly depicts products serving NCAA Division I sports and professional sports as constituting a separate product market:

58





177.    Solutions for club and youth sports also fall outside the relevant product market.  Hudl markets club and youth sports separately from the Relevant Market, offers significantly lower prices to club and youth teams (e.g., $400 for bronze, $1,000 for silver, and $1,600 for gold football packages), and competes with specialized vendors in that market.  Club and youth teams look for one-sport solutions rather than the multi-sport solutions that high schools and colleges seek. There are distinct vendors who serve specific sports at the club and youth level, along with distinct customers at each level.  Industry participants, including Hudl, view club and youth sports teams as falling outside the Relevant Market at stake here:

59

> **👥 Club and Youth Sports**
>
> Elevate your club with automatic video capture, livestreaming and sharing.
>
> **♜ High School Teams and Athletic Departments**
>
> Our all-in-one solutions simplify athletic departments and elevate every team.
>
> **🏫 Colleges and Universities**
>
> Advanced video and data solutions—with every team on one invoice and one platform.
>
> **🏆 Professional Sports**
>
> An end-to-end platform, designed for the world's top organizations.

178. Certain other products also fall outside the relevant product market. General-purpose tools such as Dropbox, Google Drive, or YouTube are not reasonable substitutes because they lack the sport-specific metadata, opponent-scouting features, and automated exchange systems required by modern high school athletics.

179. Traditional filming with a phone or consumer camera is not reasonably interchangeable with the market for sports video analysis platforms. Traditional filming provides only raw video capture—not the integrated analysis, tagging, storage, and film exchange required for competitive school athletics.

180. The school sports video analysis market's unique place in the marketplace is demonstrated by the fact that consumers continue to use Hudl despite monopolist prices and diminished services. High schools and colleges outside DI have not turned to other services or options because those services and options are not reasonably interchangeable.

181. The relevant geographic market is the United States. High schools and colleges outside the DI level generally do not look internationally for sports video analysis platforms. There are no sports video analysis platforms based outside the United States designed to meet the needs of American high schools and smaller colleges—especially for American football. Consumers in the United States cannot avoid price increases by purchasing sports video analysis platforms abroad.

182. Providers that operate outside the United States often focus on entirely different sports systems, competition calendars, coaching practices, and workflows. Their pricing, workflow design, and analytics tools are built for amateur clubs or professional academies abroad in international sports like soccer, not for U.S. public-school programs with limited budgets focused largely on American high school football and basketball. Language, time-zone, and support-infrastructure issues reinforce the domestic nature of the market.

### G.      Hudl Monopolized the Relevant Market

183.   Hudl has become the dominant provider in the U.S. school sport video analysis market and has acquired monopoly power in that market.  By its own admission, "99% of high schools use Hudl to power their athletic programs."  Hudl has also captured approximately 99% of the college market (outside the DI level).  In other words, Hudl has captured about 99% of the Relevant Market.  Hudl's market share is highly durable, having retained the vast majority of the market for over a decade.

184.   The Relevant Market mainly serves high schools.  Hudl has represented that it has captured 99% of high schools and served about 20,000 high schools.  There are substantially fewer colleges, with about 350 DI schools, 300 DII schools, and 430 DIII schools at the NCAA level, along with about 235 schools in the NAIA and 525 in the NJCAA (for a total of about 1,840 schools at the collegiate level).

185.   There are significant barriers to entry in the Relevant Market.  As an initial matter, Hudl itself has imposed barriers to entry—from the technological barriers it has constructed to its exclusive agreements with athletic associations to its exclusionary deals with critical sports clinics to its anticompetitive pricing practices.

186. By imposing technological barriers through its restrictions on exchanging film, Hudl creates powerful network effects in the school sports video

analysis market.  A sports video analysis platform is only fully useful to the customer if a school can meaningfully exchange its game film and metadata with other teams. But Hudl has locked up 99% of the Relevant Market and largely prevented cross-platform exchanges.  As a result, new entrants in the market need to overcome the fact that customers joining their platform would miss out on seamless exchanges with almost the entirety of the market.  These network effects create prohibitive switching costs and lock schools into Hudl's platform regardless of price, quality, or innovation offered by potential competitors.  This barrier, which has been imposed by Hudl for the sole purpose of stifling competition, has proven nearly insurmountable

187.  Beyond these *artificial* barriers, there are several additional barriers to breaking into the sports video analysis market.  Entering the market, for example, requires significant investment in software; equipment to film games; and infrastructure to support statistics.  Hudl bundles automated camera systems, analytics software, stats tools, and recruiting services into its platform.  A new entrant offering must compete against Hudl's integrated bundles, raising the cost and complexity of entry. It takes two to four years to launch a competitive product in this market.

188.  To enter the market, a newcomer also must overcome interface familiarity, organizational inertia, and multi-year contracts that Hudl has secured

63

with countless schools across the country. Retraining entire athletic departments across multiple sports can be costly and disruptive, making it difficult for new firms to gain initial traction. These switching costs increase the stickiness of the Hudl platform, making users more beholden to Hudl. Long-term contracts foreclose opportunities for competitors to bid for large blocks of customers and prevent rivals from reaching the scale necessary to meaningfully challenge Hudl's monopoly.

189. Hudl's monopoly power can be observed directly as Hudl can profitably raise its prices and degrade its product without causing competing firms to expand output and drive down prices. Hudl has repeatedly increased prices, restricted features, and degraded service and has faced no competitive correction. In other words, unconstrained by competitive forces, Hudl can—and does—inflate its prices at will.

190. Because Hudl has captured nearly all high schools and colleges (outside DI) and refuses to allow those schools to easily exchange their film with schools on other platforms, consumers have no choice but to remain with Hudl. Consumers have repeatedly voiced their interest in moving to another platform but observe that they have no choice as a result of the exchange barriers Hudl has constructed. In light of this dynamic, Hudl has monopoly power in the Relevant Market.

64

### H.    QwikCut Has Suffered Antitrust Injury

191.    Hudl's anticompetitive conduct has foreclosed innovative competition in the Relevant Market, causing substantial harm to competition.   Hudl has specifically targeted QwikCut with its scheme of anticompetitive conduct designed to preclude competitors, and QwikCut in particular, from making further gains in the Relevant Market.  For example, Hudl has specifically denied consumer requests to facilitate interoperability between Hudl and QwikCut.  Competitor gains in the Relevant Market, if realized, would inevitably result in lower prices, greater output, increased innovation, and increased consumer choice.

192.    Like all Hudl competitors, QwikCut is unable to fully and effectively compete with Hudl's products and services due to Hudl's anticompetitive conduct. Even though QwikCut is a more innovative company with superior products and services, Hudl has been able to maintain its monopoly and maintain supracompetitive prices by (1) maintaining exclusive league exchanges, (2) rendering it technologically infeasible to exchange film with non-Hudl platforms, (3) entering exclusive agreements with athletic associations, (4) excluding competitors from critical marketing opportunities, and (5) acquiring any competitors that pose a threat to Hudl's reign.

193.    As a direct and proximate result of Hudl's anticompetitive conduct, QwikCut has suffered antitrust injury in the form of lost business opportunities,

65

impaired access to customers and essential content, and diminished ability to compete on price, quality, and innovation in the market for platforms for capturing, storing, analyzing, organizing, and exchanging sports video and data for school sports programs.  Hudl's anticompetitive conduct has caused significant damage to QwikCut in the form of millions of dollars in lost revenues and profits, diminished sales opportunities, and higher costs to pursue entry into the Relevant Market.

194.  Hudl's actions were intended to and did harm competition in the Relevant Market.  Hudl has inflicted precisely the types of injuries antitrust laws are meant to prevent.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Sherman Act, 15 U.S.C. § 2
### (Monopolization by Defendant Hudl)

195.  QwikCut incorporates and realleges paragraphs 1 through 194 as though fully set forth herein.

196.  Hudl has engaged in a scheme to monopolize the market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, organizing, and exchanging sports video and data for school sports programs and athletic departments.

197.  The U.S. market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, organizing, and

exchanging sports video and data for school sports programs and athletic departments is a relevant antitrust market, and Hudl has monopoly power in that market.

198. Hudl willfully and wrongfully obtained and maintained monopoly power by using restrictive exclusionary conduct, rather than using greater business acumen or competition on the merits, in violation of 15 U.S.C. § 2.

199. Each of Hudl's actions individually and collectively increased, maintained, or protected its monopoly in the Relevant Market.

200. Hudl's anticompetitive acts include (for example) creating and enforcing technological obstacles to using other platforms, maintaining exclusive agreements with athletic associations, excluding competitors from sports clinics, acquiring horizontal competitors and innovative sports technology companies, and engaging in anticompetitive pricing practices.

201. While each of Hudl's acts is anticompetitive in its own right, Hudl's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

202. Hudl's anticompetitive acts have had harmful effects on competition and consumers, resulting in higher prices, degraded services, hindered innovation, and limited consumer choice.

203.   Hudl's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Hudl's anticompetitive and unlawful conduct.

204.   Hudl operates across the United States and its conduct affects a substantial volume of interstate commerce.

205.   As a result of Hudl's anticompetitive conduct, QwikCut has been injured, and will continue to be injured, in the form of lost business opportunities, impaired access to customers and essential content, and diminished ability to compete on price, quality, and innovation.

## COUNT II
### Violation of the Sherman Act, 15 U.S.C. § 2
### (Attempted Monopolization by Defendant Hudl)

206.   QwikCut incorporates and realleges paragraphs 1 through 194 as though fully set forth herein.

207.   Hudl has engaged in an attempt to monopolize the U.S. market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, organizing, and exchanging sports video and data for school sports programs and athletic departments.

208.   The U.S. market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, organizing, and exchanging sports video and data for school sports programs and athletic

68

departments is a relevant antitrust market, and Hudl has attempted to obtain a power in that market.

209. Hudl willfully and wrongfully attempted to obtain and maintain monopoly power by using restrictive, exclusionary conduct, rather than using greater business acumen, in violation of 15 U.S.C. § 2.

210. Hudl acted with a specific intent to monopolize and destroy competition in the market by (for example) creating and enforcing technological obstacles to using other platforms, maintaining exclusive agreements with athletic associations, excluding competitors from sports clinics, acquiring horizontal competitors and innovative sports technology companies, and engaging in anticompetitive pricing practices.

211. While each of Hudl's acts is anticompetitive in its own right, Hudl's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

212. Hudl's anticompetitive acts have had harmful effects on competition and consumers, resulting in higher prices, degraded services, hindered innovation, and limited consumer choice.

213. Hudl's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Hudl's anticompetitive and unlawful conduct.

69

214. Hudl operates across the United States and its conduct affects a substantial volume of interstate commerce.

215. As a result of Hudl's anticompetitive conduct, QwikCut has been injured, and will continue to be injured, in the form of lost business opportunities, impaired access to customers and essential content, and diminished ability to compete on price, quality, and innovation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks judgment in its favor as follows:

A.    Declare that Hudl has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for suites or packages of software, hardware, and services that operate together to capture, store, analyze, and exchange sports video and data for school sports programs and athletic departments, in violation of Section 2 of the Sherman Act;

B.    Enter relief as needed to cure any anticompetitive harm;

C.    Award QwikCut damages determined to have been sustained by them, trebled as provided by law;

D.    Permanently enjoin and restrain Hudl, their affiliates, successors, heirs, transferees, assignees, and officers, directors, partners, agents, and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the

70

conduct alleged herein, or from engaging in any other conduct having a similar purpose or effect;

E.   Awarding the costs and expenses of this litigation to QwikCut;

F.   Awarding reasonable attorneys' fees and costs to QwikCut as provided by law;

G.   Awarding pre-judgment and post-judgment interest to QwikCut; and

H.   For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial for any and all issues triable by a jury.

71

Dated: April 24, 2026

RESPECTFULLY SUBMITTED,

/s/ Jennifer R. Scullion
David R. Buchanan
Jennifer R. Scullion
SEEGER WEISS LLP
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
Tel: 973-639-9100
Fax: 973-679-8656
dbuchanan@seegerweiss.com
jscullion@seegerweiss.com

Jeremy R. Kasha (New York Bar No.2947463 )**
SEEGER WEISS LLP
100 Church Street 8th Floor
New York, New York 10007
Tel: 212-584-0700
Fax: 212-584-0799
jkasha@seegerweiss.com

Benjamin J. Widlanski (Florida Bar No. 1010644)**
bwidlanski@kttlaw.com
Jorge L. Piedra (Florida Bar No. 88315)**
jpiedra@kttlaw.com
Abe A. Bailey (Florida Bar No. 1010335)**
abailey@kttlaw.com
Brandon M. Sadowsky (Florida Bar No. 1052643)**
bsadowsky@kttlaw.com
KOZYAK TROPIN &
THROCKMORTON LLP
2525 Ponce de Leon Boulevard, 9th Floor
Miami, FL 33134
(305) 372-1800

Jeffrey L. Berhold**
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800 (telephone)
jeff@berhold.com

**\* To Be Admitted Pro Hac Vice**

72