## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

QWIKCUT, LLC,

                Plaintiff,

v.

HUDL, INC.,

                Defendant.

Case No. 2:26-CV-02334-CCC-SDA

Hon. Claire C. Cecchi, U.S.D.J.
Hon. Stacey D. Adams, U.S.M.J.

***Oral argument requested***

***Document electronically filed***

## MEMORANDUM IN SUPPORT OF
## HUDL, INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED
## (CORRECTED) COMPLAINT

WALSH PIZZI O'REILLY FALANGA LLP
100 Mulberry Street, 15th Floor
Newark, NJ 07102

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ......................................................................................... 6

ARGUMENT ...................................................................................................... 6

I. QwikCut Does Not Define a Valid Product Market............................................ 7

    A. QwikCut's "Suites or Packages" Are Not Interchangeable. .................. 9

    B. The Alleged Market Wrongly Excludes Reasonable Substitutes......... 14

    C. QwikCut's Market Share Allegations Further Confirm That
        The Relevant Market Is Not Plausibly Defined .................................. 21

II. QwikCut Does Not Plausibly Allege Any Anticompetitive Conduct.............. 22

    A.  QwikCut's Acquisitions Theory Is Time-Barred ............................... 22

    B. QwikCut's "Technological Barriers" Theory Is Barred By
        Supreme Court Refusal-To-Deal Precedent......................................... 25

    C. QwikCut Does Not Plausibly Allege Hudl's Marketing
        Agreements Are Unlawful .................................................................. 30

    D. The Complaint Fails to Allege That Hudl Has Engaged in
        Anticompetitive Bundling Practices .................................................. 32

    E. Hudl Is Not An Essential Facility ....................................................... 36

    F. QwikCut's "Playbook" Allegations Fail As A Matter Of Law ........... 38

CONCLUSION ................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Shape Trios A/S v. Align Tech., Inc.*,
    2019 WL 3824209 (D. Del. Aug. 15, 2019)......................................................40

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ...........................................................37

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ...........................................................32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)...................................................................29, 30

*Baar v. Jaguar Land Rover N. Am., LLC*,
    295 F. Supp. 3d 460 (D.N.J. 2018)................................15, 16, 19, 20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................6, 25, 34

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...........................................................7, 17, 20, 21

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .............................................................6

*Byars v. Bluff City News Co., Inc.*,
    609 F.2d 843 (6th Cir. 1979) ...........................................................36

*CAE Inc. v. Gulfstream Aerospace Corp.*,
    203 F. Supp. 3d 447 (D. Del. 2016).................................................31

*Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*,
    613 F.2d 727 (9th Cir. 1979) ...........................................................27

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*,
    912 F. Supp. 747 (D.N.J. 1995)..................................................16, 20

iii

*In re Copaxone Antitrust Litig.*,
    2026 WL 982916 (D.N.J. Apr. 13, 2026)............................................................23

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
    2015 WL 1969380 (D.N.J. Apr. 29, 2015)....................................................11, 14

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ...............................................................................39

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .........................................................................29, 30

*FTC v. Tempur Sealy Int'l, Inc.*,
    768 F. Supp. 3d 787 (S.D. Tex. 2025)................................................................18

*Hafez v. Equifax Info. Servs., LLC*,
    666 F. Supp. 3d 455 (D.N.J. 2023).....................................................................18

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005) ...............................................................................22

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
    32 F.4th 242 (3d Cir. 2022) ................................................................................29

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
    90 F.3d 737 (3d Cir. 1996)............................................................................37, 38

*Kerwin v. Casino*,
    802 F. App'x 723 (3d Cir. 2020) (per curiam) ...................................................37

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ................................................................................9

*Larry Pitt & Associates v. Lundy Law, LLP*,
    57 F. Supp. 3d 445 (E.D. Pa. 2014)..............................................................18, 19

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) .....................................................................34, 36, 39

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011) .........................................................23

*MCI Comm'cns Corp. v. AT&T Co.*,
     708 F.2d 1081 (7th Cir. 1983) ................................................................36

*Monarch Ent. Bureau, Inc. v. New Jersey Highway Auth.*,
     715 F. Supp. 1290 (D.N.J.),
      *aff'd*, 893 F.2d 1331 (3d Cir. 1989) ...................................................38

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*,
     838 F.3d 421 (3d Cir. 2016) ...............................................................22

*NCAA v. Alston*,
     594 U.S. 69 (2021) ...............................................................................25

*New York v. Facebook, Inc.*,
     549 F. Supp. 3d 6 (D.D.C. 2021),
     *aff'd*, 66 F.4th 288 (D.C. Cir. 2023) ....................................23, 28, 39

*New York v. Meta Platforms, Inc.*,
     66 F.4th 288 (D.C. Cir. 2023) ..............................................................28

*Newcal Indus., Inc. v. Ikon Office Sol.*,
     513 F.3d 1038 (9th Cir. 2008) ........................................................17, 20

*NicSand, Inc. v. 3M Co.*,
     507 F.3d 442 (6th Cir. 2007) (en banc) ...............................................32

*Novell, Inc. v. Microsoft Corp.*,
     731 F.3d 1064 (10th Cir. 2013) ......................................................29, 30

*Ohio v. Am. Express Co.*,
     585 U.S. 529 (2018) .................................................................................7

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
     555 U.S. 438 (2009) ...............................................26, 27, 29, 38, 40

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
     310 F. Supp. 3d 1002 (E.D. Mo. 2018) ................................................17

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
     886 F.3d 332 (3d Cir. 2018) ...........................................................33, 40

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
     2019 WL 635405 (D. Del. Feb. 14, 2019) ......................................11, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ......................................................7, 8, 10, 12, 17, 19

*Rx Sols., Inc. v. Caremark, L.L.C.*,
   164 F.4th 436 (5th Cir. 2026) ...............................................................11, 12, 14

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3d Cir. 2010) .............................................................................6

*Shire US, Inc. v. Allergan, Inc.*,
   375 F. Supp. 3d 538 (D.N.J. 2019)........................................................34, 35, 36

*Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*,
   2023 WL 8866555 (3d Cir. Dec. 22, 2023)..........................................................31

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...........................................................................7, 36, 40

*Synthes, Inc. v. Emerge Medical, Inc.*,
   2012 WL 4473228 (E.D. Pa. Sept. 28, 2012)......................................................13

*TI Investment Services, LLC v. Microsoft Corp.*,
   23 F. Supp. 3d 451 (D.N.J. 2014)......................................................................13

*Tunis Bros. Co. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1992) ......................................................................11, 13

*United States v. Apple Inc.*,
   2025 WL 1829127 (D.N.J. June 30, 2025)....................................................28, 29

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) .............................................................................21

*United States v. Google LLC*,
   803 F. Supp. 3d 18 (D.D.C. 2025)....................................................................27

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)...................................................................................7, 22

*United States v. Microsoft Corp.*,
   147 F.3d 935 (D.C. Cir. 1998)..........................................................................28

vi

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam)...........................................39

*United States v. Sabre Corp.*,
452 F. Supp. 3d 97 (D. Del. 2020),
*vacated on other grounds*,
2020 WL 4915824 (3d Cir. July 20, 2020).......................................................14

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)........................................... 26, 27, 28, 29, 36, 38

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010) ...............................................................24

*Z Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) ............................................................23

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971)..........................................................................24

**Statutes**

15 U.S.C. § 2.............................................. 5, 6, 7, 22, 23, 26, 29, 32, 33

15 U.S.C. § 15b...............................................................................23, 24

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................1, 22, 33

**INTRODUCTION**

Having failed to compete successfully with Hudl on the merits, QwikCut now asks this Court to provide it with free access to the valuable and innovative platform Hudl has spent decades building.  The antitrust laws do not require Hudl to share the source of its advantage with its rivals.  Because QwikCut has failed to plead either of the essential elements of a Sherman Act monopolization claim—a valid product market and anticompetitive conduct—QwikCut's complaint should be dismissed.

*First*, QwikCut's "suites or packages" market is both overinclusive and underinclusive.  It is overinclusive because it comprises hardware and software products that are not reasonably interchangeable.  And it is underinclusive because it omits product packages sold to NCAA Division I, professional, youth, and club sports teams that are reasonably interchangeable with the packages sold to high schools, Division II, and Division III schools that QwikCut alleges are part of the market.  QwikCut's market definition is invalid as a matter of law twice over.

*Second*, none of the complaint's grab-bag efforts to allege anticompetitive conduct—which QwikCut labels a "playbook"—is sufficient under Rule 12(b)(6), whether considered individually or in the aggregate.  QwikCut's acquisitions theory is time-barred because the only well-pled acquisitions were completed nearly 15 years ago.  QwikCut's "technological barriers" theory is foreclosed by the Supreme Court's refusal-to-deal precedent.  QwikCut's exclusive-dealing theory fails as a

matter of law for lack of any meaningfully alleged anticompetitive harm attributable to Hudl's marketing agreements. And QwikCut's bundling and pricing allegations likewise fail to plausibly show anticompetitive harm. QwikCut's two other long-shot efforts fail too. Hudl's platform is not an essential facility, even to the extent antitrust liability could ever be imposed under that doctrine. And QwikCut cannot maintain a claim based on Hudl's alleged "playbook" where none of the alleged conduct that constitutes that playbook is itself anticompetitive.

For all of these reasons, QwikCut's complaint is foreclosed by longstanding antitrust law and should be dismissed in its entirety.

## BACKGROUND

Hudl is a sports technology company that provides a cloud-native, software-as-a-service platform for sports organizations. Hudl offers "various suites of software and services" used by sports teams worldwide at every level of competition, from club to high school, college, and professional teams. Compl. ¶ 18.

Video is a foundational medium in sports and central to Hudl's platform. Hudl offers cameras that record "every second of the action," with recordings automatically uploaded to Hudl's online platform. *Id.* ¶¶ 6, 167. While Hudl's cameras are the only cameras that upload automatically to Hudl's platform, customers are not required to use or purchase Hudl's cameras in order to use or purchase Hudl's other products. *Id.* ¶ 132. Customers can also upload videos

2

recorded on non-Hudl cameras to Hudl's platform for analysis. *Id.* ¶¶ 65, 95. Hudl hosts an extensive, ever-growing, and highly valuable library of sports recordings from which coaches and athletes can derive important insights. *Id.* ¶ 167.

To enable customers to take advantage of its video library, Hudl offers a wide range of data and analytics tools that coaches and athletes can use to review their own, their team's, and their opponent's performances. *Id.* ¶¶ 18, 167. For example, users can tag, analyze, exchange, and annotate video on Hudl's platform. *Id.* ¶ 166.

Hudl's online platform also facilitates the easy sharing of sports video and data between coaches and teams. This was how Hudl got its start, replacing the more difficult and time-consuming process of swapping DVDs at pre-arranged meet-ups with easy digital exchanges. Today, Hudl's video exchange products, including League Exchange, enable schools to easily share game footage with other schools in the same league or conference. *Id.* ¶ 7. Hudl was "among the first platforms to use cloud-based technology to make game and practice video available online for faster access and easier use." *Id.* ¶ 40. QwikCut acknowledges that Hudl's technology "transformed coaching." *Id.* ¶ 42. Hudl's League Exchange product gave coaches back hours each week that they could refocus on game-planning and player development; "[w]hat would otherwise take hours to manually transfer video to other teams takes seconds through a league exchange." *Id.* ¶¶ 66–67.

The "coaching toolkits" that Hudl offers to schools, athletic departments,

3

teams, and other customers are not one-size-fits-all. *Id.* ¶ 166. Given the significant variety of hardware and software tools that Hudl offers, some of which are tailored to certain sports, or to certain levels of competition (e.g., to professional teams as opposed to youth clubs), Hudl offers its customers dozens of customizable packages. Hudl works with its customers to put together the packages that make the most sense for that customer, based on the number of sports and teams and analytical needs of the school's athletic department and coaching staff. *See id.*

Hudl also partners with athletic conferences, clinics, and other organizations to market its products and services. This includes partnership agreements with a range of private, independent, and statewide athletic associations, as well as the National Association of Intercollegiate Athletes and the National Junior College Athletic Association. *Id.* ¶122. Hudl also maintains partnerships with certain football coaching clinics, including the Glazier Clinics and the Nike Coach of the Year Football Clinics. *Id.* ¶ 125. At these clinics, Hudl, alongside other industry participants, can market its products to football coaches. *Id.* ¶ 126.

Over time, Hudl has expanded its offerings through a series of acquisitions that have enabled Hudl to better serve its customers. The complaint focuses on Hudl's 2011 acquisition of Digital Sports Video ("DSV") and 2012 acquisition of APEX. *Id.* ¶¶ 50, 55. Both companies offered sports video coaching and analysis tools to high schools and colleges. *See id.* QwikCut does not allege that Hudl raised

4

prices or reduced quality following either transaction.  *See* Compl. ¶¶ 49–62.

QwikCut is a competitor to Hudl.  *Id.* ¶ 17.  QwikCut "provides video capture, storage, analysis, and solutions for professional and amateur sports programs."  *Id.* ¶¶ 16, 169.  QwikCut describes its product as an "all-in-one video platform" that offers "unlimited storage, player grading, advanced stats, and other services," and claims (without supporting facts) that it is "a more innovative company with superior products and services" compared to Hudl.  *Id.* ¶¶ 13, 169, 192.

Both Hudl and QwikCut are approved vendors for the New Jersey Super Football Conference.  *Id.* ¶¶ 15, 131.  Certain conference member schools have elected to purchase Hudl's suite of products—including ticketing services, video capture, and storage—instead of QwikCut's.  *Id.* ¶ 131.  QwikCut alleges this is because of Hudl's purportedly anticompetitive conduct.  *Id.*  Hudl disagrees.

QwikCut alleges that Hudl has violated Section 2 of the Sherman Act by monopolizing—or at least attempting to monopolize—a market that QwikCut defines as the "U.S. market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, organizing, and exchanging sports video and data for school sports programs and athletic departments."  *Id.* ¶¶ 183–190, 197, 208.  QwikCut alleges that Hudl has acted unlawfully in four principal ways: by allegedly (1) "acquiring its primary competitors," *id.* ¶ 45; (2) "construct[ing] a series of technological barriers to restrict

5

consumer movement and deter competition," *id.* ¶ 63; (3) "entering exclusive partnerships which hinder competition," *id.* ¶ 120; and (4) "engag[ing] in various pricing practices that hinder competition on the merits." *Id.* ¶ 128. QwikCut also alleges that Hudl's platform is "an essential facility," *id.* ¶ 119, and that Hudl's challenged conduct amounts to a "playbook of anticompetitive conduct," *id.* ¶ 133.

## LEGAL STANDARD

To survive dismissal, a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must "provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action," to get "expensive" and "potentially massive" antitrust discovery. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557–58 (2007). Conclusory allegations are "not entitled to the assumption of truth." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). Drawing "on its judicial experience and common sense," the Court instead "determine[s] whether the well-pleaded facts state a plausible claim for relief." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

## ARGUMENT

Section 2 prohibits firms from "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A monopolization claim has two necessary

6

elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Similarly, to establish a Section 2 violation for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). QwikCut's complaint does not plausibly allege any of these elements.

## I. QWIKCUT DOES NOT DEFINE A VALID PRODUCT MARKET

A Section 2 plaintiff "must first define the relevant market" because without a proper market definition "there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542–43 (2018). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Cross-elasticity of demand is the degree to which "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.* at 437–38. To survive a motion to dismiss, a

7

plaintiff must therefore "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Id.* at 436–37. "Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* at 437.

QwikCut's alleged product market definition is legally insufficient on its face. QwikCut alleges that the "relevant product market is the market for suites or packages of software, hardware, and services that operate together for capturing, storing, analyzing, and exchanging sports video and data for school sports programs and athletic departments." Compl. ¶ 166. Apparently recognizing that this is a mouthful, QwikCut also uses a shorthand: "sports video analysis market." *Id.* ¶¶ 6, 11, 180, 187. But this alleged product market is riddled with exceptions and carve-outs and is not defined by reference to cross-elasticity of demand.

QwikCut tries to artificially limit its market to "high schools and colleges outside the DI level." *Id.* ¶ 170. QwikCut thus purports to exclude from its market "high-end sports video analysis platforms—like Catapult or DV Sport—which are used in professional sports and at the NCAA Division I level." *Id.* ¶ 171. But these are companies with whom Hudl competes even at the high school level. *See id.* ¶ 173. QwikCut also excludes "club and youth sports" from its product market. *Id.*

¶ 177.  And QwikCut excludes from its market commonly used video sharing tools like "Dropbox, Google Drive, [and] YouTube" because "they lack the sport-specific metadata, opponent-scouting features, and automated exchange systems required by modern high school athletics."  *Id.* ¶ 178.  QwikCut's reasons for its gerrymandering are obvious: in a properly defined market, Hudl's market share is well short of the levels typically required.  *See, e.g.*, *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (explaining that the Supreme Court has never found monopoly power with "less than 75% market share").

The complaint's product market fails as a matter of law for at least two independent reasons:  ***First***, QwikCut's aggregation of "suites or packages of software, hardware, and services" results in a market consisting of products that are not reasonably interchangeable and for which there is no cross-elasticity of demand.  ***Second***, QwikCut's convoluted limitation of its market to "suites or packages" that "operate together for capturing, storing, analyzing, and exchanging sports video and data," while excluding club, youth, NCAA Division I, and professional sports, results in an impermissibly gerrymandered market.

## A.     QwikCut's "Suites or Packages" Are Not Interchangeable.

QwikCut's made-for-litigation product market does not exist in economic reality.  QwikCut's sweeping definition aggregates numerous products for which markets do exist, and for which there are many substitute products competing with

9

Hudl's offerings.  QwikCut has not attempted to define any of those product markets.

Instead, QwikCut defines a single market allegedly consisting of "suites or packages" that are not reasonably interchangeable and for which there is no cross-elasticity of demand.

QwikCut's threshold problem is that its alleged market encompasses too wide a variety of hardware and software products.  It appears to include (1) "all-in-one coaching software," Compl. ¶ 167; (2) statistics tools, *id.* ¶ 187; (3) recruiting services, *id.*; (4) smart cameras, *id.* ¶¶ 6, 132, 167; and (5) league exchange pools, *id.* ¶¶ 7–8, 64–67; among others, *id.* ¶ 166.  The complaint acknowledges that these categories of products are sold (by Hudl and others) and consumed in heterogeneous combinations, with different schools assembling different packages for different purposes.  *See id.* ¶ 166 ("These platforms provide tools for capturing, uploading, storing, organizing, tagging, analyzing, and exchanging game video and associated metadata (e.g., play tags, down-and-distance, and angle synchronization) among teams, conferences, and state associations.  These coaching toolkits are designed to meet the needs of school sports programs like football, basketball, and volleyball.").  But there are no allegations explaining how these products are reasonably interchangeable and combine to make a single, unified product market.  *See Queen City Pizza*, 124 F.3d at 436 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of

10

demand between the product itself and substitutes for it.").  As such, QwikCut's market definition is incompatible with the Third Circuit's direction that a product market be "defined as those commodities reasonably interchangeable by consumers for the same purposes" and be "characterized by a cross-elasticity of demand." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1992).

QwikCut's alleged market amounts to an overarching, overbroad label affixed to a collection of non-interchangeable products—the exact sort of catch-all aggregation that courts in this Circuit and others have repeatedly rejected.  *See, e.g.*, *Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443 (5th Cir. 2026) (affirming dismissal of claims premised on broad "prescription medication market" where complaint contained "no allegations regarding reasonable interchangeability or cross-elasticity of demand"); *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) ("A bare allegation of 'laboratory services' is too broad and imprecise by itself to adequately define the relevant product market."); *Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 2015 WL 1969380, at *5 (D.N.J. Apr. 29, 2015) (dismissing claim where plaintiff "failed to allege any facts sufficient to support a finding of a K–12 educational materials market" and observing that a "kindergarten textbook is not interchangeable with a high school textbook").

Just as in those cases, each of the products QwikCut identifies has its own set

11

of competitors and substitutes, and may thus have its own market, but there are no allegations that collectively these products constitute one market. *See Rx Sols.*, 164 F.4th at 443. Take Hudl's smart cameras, for instance. A coach or athletic director could purchase one of Hudl's cameras to capture video, or could purchase a camera from a wide range of competing manufacturers like Pixellot or Panasonic or Canon, or could even just record using an iPad or another mobile device. Instead of acknowledging the complexities of the market for cameras, QwikCut lumps them in alongside at least a half-dozen other products in one artificial "market."

The result is that QwikCut has defined a market that consists solely of products that cannot be reasonably substituted for one another, as the Third Circuit requires. *See Queen City Pizza*, 124 F.3d at 436. No two "suites or packages" are alike. The bespoke packages of team-performance tracking and analysis tools, recruiting tools, and other software solutions that Hudl offers cannot be compared apples-to-apples with those of Hudl's competitors. The packages that customers purchase from Hudl and its competitors vary too widely, depending on the teams, sports, level of competition, and program needs. A package combining coaching software with a smart camera, for example, does not perform the same function as a package consisting solely of recruiting software. A school using video to evaluate its own individual players' performance would not substitute recruiting software for that purpose; and a high school looking to promote a recruit (or a college team

12

evaluating prospects) would not turn to a coaching-software-and-camera bundle.  By the same token, raising the price of a coaching-and-camera bundle would not redirect demand toward standalone recruiting software—which is the textbook indicator that two products do *not* belong in the same market.  *See Tunis Bros.*, 952 F.2d at 722.

*Synthes, Inc. v. Emerge Medical, Inc.* illustrates the point.  2012 WL 4473228 (E.D. Pa. Sept. 28, 2012).  In *Synthes*, the court dismissed antitrust counterclaims that were premised on a market definition that grouped "drill-bits," "guidewires," and "surgical screws" into a single market without "any indication of distinctions among apparently comparable products within the market and what, if any, other competitors exist in the market."  *Id.* at *9.  QwikCut likewise aggregates— improperly—different software and hardware products into a single market, without acknowledging distinctions between those products or the numerous competitors whose products the complaint aggregates into one purported market.

*TI Investment Services, LLC v. Microsoft Corp.* is equally instructive.  23 F. Supp. 3d 451 (D.N.J. 2014).  There, the court dismissed a complaint that aggregated Voice-over Internet Protocol services into an alleged market without identifying "what the possible substitutes or interchangeable products" were or explaining whether those substitutes were interchangeable with cellular services or traditional land lines.  *Id.* at 470.  *TI Investment Services*, like this case, involved both overinclusiveness and underinclusiveness: improper aggregation coupled with

13

artificial exclusions of reasonably substitutable products.

The same deficiencies that render QwikCut's market definition invalid likewise resulted in dismissal of claims premised on markets for "prescription medication," *Rx Solutions*, 164 F.4th at 443; "laboratory services," *Prescient*, 2019 WL 635405, at *6; and "K-12 educational materials," *Debjo*, 2015 WL 1969380, at *5. Those plaintiffs tried to group products with different uses, that competed along different dimensions, without explaining how the products within the defined market were reasonably interchangeable. That same deficiency requires dismissal here.

### B.    The Alleged Market Wrongly Excludes Reasonable Substitutes

QwikCut's market definition suffers from a related, but distinct, deficiency: it carves out a variety of products that could constitute reasonable substitutes and that therefore should be included in the market. A properly defined market must "correspond to the commercial realities of the industry." *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 141 (D. Del. 2020), *vacated on other grounds*, 2020 WL 4915824 (3d Cir. July 20, 2020). QwikCut's does not.

At least two particular carve-outs from QwikCut's alleged market are facially implausible. ***First***, QwikCut excludes NCAA Division I and professional sports teams from the alleged market, even though it cannot be reasonably disputed that they represent a significant proportion of the sports technology market. ***Second***, QwikCut excludes club and youth sports, though again, they are meaningful

14

segments of the market and QwikCut has no plausible factual allegation from which the Court could infer that sports technology sold to high schools cannot be substituted for products sold to club teams.  Each is sufficient basis for dismissal.

***NCAA Division I and Professional Teams.*** QwikCut's effort to exclude Division I and professional sports teams from its alleged product market does not make sense.  The sports hardware, software, and services Hudl and its competitors sell to high schools and Division II and III colleges are reasonably interchangeable with the products they and others sell to Division I colleges and professional teams.

QwikCut anchors its attempt to separate Division I and professional sports technology into an entirely separate product market by reference to two "ultra high-end sports video analysis platforms" that have meaningful market shares at those levels of competition: Catapult and DV Sport.  Compl. ¶ 171.  QwikCut alleges that Catapult and DV Sport differ from QwikCut and Hudl because they have higher-end features.  *Id.*  Even if that were true—and Hudl disputes it—differences in features offered by Hudl, Catapult, and DV Sport are not enough to distinguish the entire markets in which they compete.  *See Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 466 (D.N.J. 2018) ("[P]roducts need not be perfectly fungible to be considered reasonably interchangeable for market-definition purposes.").

*Baar* is directly on point.  There, the court rejected a proposed "market for exporting [Jaguar Land Rover] Vehicles for resale" because, notwithstanding

15

consumer preferences for the manufacturer's allegedly "unique" SUVs, those vehicles were not "impervious to the greater luxury SUV primary and export markets in the United States" filled with competing brands like "Lexus, BMW, Mercedes, Audi, Bentley, Porche, [and] Maserati." *Id.* In other words, some differences in features do not indicate that products are not reasonably substitutable. *See also Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 769 (D.N.J. 1995) (rejecting proposed market that excluded some manufacturers' trucks because of feature differences between them). And here, QwikCut has not sufficiently alleged that feature differences between high school and college sports technology are so great that the products are not reasonably interchangeable.

QwikCut's true distinction between these alleged markets rests on customers' budgets, not feature differences. QwikCut wrongly alleges that "high school and small college programs neither use nor can afford" higher-end products that Division I and professional teams purchase. Compl. ¶ 172. In other words, QwikCut wrongly claims that products sold in the purportedly higher-end market are "too complex and expensive for high schools and smaller colleges." *Id.*

But again, this is not enough to establish that the products offered to large high schools and Division II and III schools are not reasonably interchangeable with the products offered to *any* Division I school or professional program. As the Ninth Circuit explained, "consumers do not define the boundaries of the market; the

16

products or producers do." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Brown Shoe*, 370 U.S. at 325). Put differently, a plaintiff may not confine the market to "commodities reasonably interchangeable [for] a particular [customer]," like a Division I or professional team, but must allege a market for "commodities reasonably interchangeable by consumers [in general] for the same purpose." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1017 (E.D. Mo. 2018) (quoting *Queen City Pizza*, 124 F.3d at 438).

QwikCut's market definition is thus legally insufficient under *Brown Shoe*, *Queen City Pizza*, and other precedential decisions. In *Brown Shoe*, the Supreme Court rejected the plaintiff's attempt to subdivide the shoe market by price and quality and explained that it "would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00." *Brown Shoe*, 370 U.S. at 326. Likewise, in *Queen City Pizza*, the Third Circuit affirmed dismissal of antitrust claims where the plaintiff franchisees attempted to limit the relevant market to Domino's-approved ingredients and supplies, explaining that the inquiry does not depend on a plaintiff's preferences or circumstances but rather whether "consumers for the same purposes" would regard those products as "commodities reasonably interchangeable." *Id.* at 438.

Similarly, here—without even pleading a particular number that QwikCut believes constitutes the dividing line—QwikCut's market definition unrealistically

17

uses higher-priced products preferred by *some* Division I programs and *some* professional teams as a basis to distinguish *all* Division I and professional teams from a separate market of high schools and Division II and III colleges. But product pricing and features exist on a continuum, and many high schools and Division II and III colleges are paying more than some Division I colleges for similar products. *See FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 819 (S.D. Tex. 2025) (rejecting allegedly distinct product market of premium mattresses over $2,000).[1]

QwikCut's concession that Hudl is a "small player in the college sports video analysis and exchange market," Compl. ¶ 99, should dispel any lingering doubt as to whether these are separate markets. Hudl competes in both segments of the market, often with the same general offerings. QwikCut's flawed line-drawing is analogous to the deficient market definition in *Larry Pitt & Associates v. Lundy Law, LLP*, 57 F. Supp. 3d 445 (E.D. Pa. 2014). There, the court rejected a market allegedly limited to "small" personal injury, social security disability, and workers' compensation law firms. *Id.* at 451. The court reasoned that "firms of any size can

---

[1] Data published by the Department of Education confirms this. https://ope.ed.gov/athletics/#/compare/search. For example, in 2024, Division I Mississippi Valley State University's operating expenses for men's sports teams were $720,579, while Division II Grand Valley State University spent $1,676,115—more than twice as much. Chicago State University, another Division I school, spent only $200,894 on operating expenses for its men's teams. Other examples abound. QwikCut's categorical distinction between Division I and Divisions II and III is implausible. The Court may take judicial notice of these facts. *See Hafez v. Equifax Info. Servs., LLC*, 666 F. Supp. 3d 455, 457 n.2 (D.N.J. 2023).

and do handle" the same legal services and the plaintiff "provide[d] absolutely no factual basis for excluding from its market definition the many law firms which provide the same legal services as the firms within its proposed market definition." *Id.* QwikCut's effort to exclude larger schools, where Hudl's market penetration is lower, serves only to wrongly inflate Hudl's alleged market share.

By artificially narrowing the alleged market, QwikCut renders it unrealistic. *See Baar*, 295 F. Supp. 3d at 466. Hudl sells reasonably interchangeable products across the high school and college levels. That some (but not all) Division I colleges pay more than some high schools and Division II and III colleges does not alter the fact that Hudl competes with an array of rivals in both segments of the same market.

For the same reasons, the Hudl marketing materials that the complaint cites do not establish the existence of a separate market for NCAA Division I and professional teams. The cited statements describe Hudl's origins in 2006, explaining that its success began when it sought to bring high schools and smaller colleges solutions similar to what NFL and Division I football programs already had. Compl. ¶ 174. Those statements do not establish any limitation on the products Hudl offers today. Though Hudl has different webpages for different customer segments, that does not establish distinct product markets that have no cross-elasticity or reasonable interchangeability. *See* Compl. ¶¶ 175–76; *Queen City Pizza*, 124 F.3d at 438.

Likewise, the fact that Hudl enables "users at the college level … to send and

19

receive .xchange files to facilitate cross-platform exchanges," but has allegedly "removed this option" for high school teams who wish to download video from Hudl's online platform, Compl. ¶¶ 99–100, does not alter the analysis either. First, this does not explain how Division I colleges can be distinguished from Division II and III colleges. And second, this minor difference in features available across competition levels within the overall market does not establish the existence of separate high school and college markets. *See Baar*, 295 F. Supp. 3d at 466; *Coast Cities*, 912 F. Supp. at 769.

***Club and Youth Sports.*** QwikCut's exclusion of "club and youth sports" from the relevant market fails for the same reasons. Again, QwikCut improperly attempts to convert a market segment into a separate product market by focusing on customers' budget constraints, not cross-elasticity of demand. *See Newcal*, 513 F.3d at 1045 ("consumers do not define the boundaries of the market"); *Brown Shoe*, 370 U.S. at 326. QwikCut alleges that "Hudl markets club and youth sports separately from the Relevant Market, offers significantly lower prices to club and youth teams . . . and competes with specialized vendors in that market." Compl. ¶ 177.

But it is immaterial that Hudl markets products targeted to different customers differently. That does not establish the existence of separate markets. That Hudl offers more basic versions of its hardware and software packages for some club and youth sports than it offers some high schools is not evidence of separate markets,

20

either.  Just like in *Brown Shoe*, QwikCut is impermissibly trying to subdivide markets based on a spectrum of price and quality differences.  *See* 370 U.S. at 325–28.  QwikCut's unduly narrow market definition is improper.

### C.    QwikCut's Market Share Allegations Further Confirm That The Relevant Market Is Not Plausibly Defined

The complaint's market share allegations underscore the insufficiency of QwikCut's market definition.  QwikCut alleges that "99% of high schools use Hudl to power their athletic programs," and from this concludes that "Hudl has captured about 99% of the Relevant Market."  Compl. ¶ 183.  QwikCut does not allege what Hudl's market share would be in a market properly defined to include NCAA Division I colleges, professional teams, club and youth sports programs, and products offered by competitors like Dropbox, Google Drive, and YouTube.  And even in just the high school market, QwikCut's market share calculation simplistically assumes that every high school using at least one Hudl product counts toward Hudl's market share, even when—by QwikCut's own allegations—a school may be using multiple "suites or packages" of hardware, software, and services.  *See id.*  The complaint acknowledges, for example, a coach who chose to re-sign with QwikCut for football but Hudl for basketball.  *Id.* ¶ 156.  If a single school uses different vendors for different sports, as is common, then merely counting schools "in which Hudl has some share" cannot meaningfully measure market power.  *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184 (3d Cir. 2005) (examining

both revenue and unit numbers in assessing market power).

QwikCut's misleading market share allegations compound QwikCut's deficient market definition.  Because QwikCut has not alleged a coherent "suites or packages" product market, or included the reasonably interchangeable products that any plausible definition would encompass, QwikCut vastly overstates Hudl's market share.  This case illustrates why, without a properly defined market, a plaintiff cannot sufficiently allege the monopoly power that Section 2 requires. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 433–34 (3d Cir. 2016).

## II.   QWIKCUT DOES NOT PLAUSIBLY ALLEGE ANY ANTICOMPETITIVE CONDUCT

QwikCut's claims should be dismissed for a separate, additional reason: the complaint does not plausibly allege "the willful acquisition or maintenance" of monopoly power through any anticompetitive conduct.  *See Grinnell*, 384 U.S. at 570–71.  Instead, the complaint offers a series of meritless allegations that fail on their own terms under Rule 12(b)(6).  *See* Compl. ¶¶ 16–40.

### A.   QwikCut's Acquisitions Theory Is Time-Barred

The first of QwikCut's four attempts to cobble together a monopolization case fails under a straightforward application of the statute of limitations.  QwikCut specifically identifies two acquisitions, from 2011 and 2012, that it believes harmed competition.  Compl. ¶¶ 49–58.  Then, in two scant paragraphs, QwikCut alleges

that Hudl has engaged in a more recent series of acquisitions—without pleading any facts from which the Court could infer those more recent acquisitions harmed competition.  None of this suffices to state an antitrust claim.

***Time-Barred Acquisitions.***  QwikCut's allegations concerning Hudl's 2011 acquisition of DSV and 2012 acquisition of APEX are time-barred.  The Sherman Act's statute of limitations provides that "[a]ny action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  QwikCut did not file its complaint until 2026—about 15 years after these acquisitions were made.

Courts dismiss at the pleading stage antitrust claims premised on time-barred acquisitions, whether under Section 15b or the equitable doctrine of laches.  *See, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 597–604 (6th Cir. 2014) (affirming dismissal of a merger-based Section 2 claim and rejecting plaintiff's invocation of the "continuing violations doctrine"); *In re Copaxone Antitrust Litig.*, 2026 WL 982916, at *11 (D.N.J. Apr. 13, 2026) (affirming dismissal of untimely Sherman Act claims); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 45 (D.D.C. 2021) (dismissing antitrust claims and noting the "four-year limitation for private antitrust actions is long enough to enable potential plaintiffs to observe the actual effects of a possible antitrust violation and to calculate its potential effects"), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL

23

5008090, at \*20 (D.N.J. Oct. 20, 2011) (dismissing antitrust claims as time-barred).

QwikCut cannot invoke the sole exception to Section 15b's four-year limitations period: the continuing violations doctrine. This exception applies only when there is a "continuing conspiracy to violate the antitrust laws," where "each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and … as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (same).

As an initial matter, there is no alleged conspiracy here. Hudl is alleged to have acted unilaterally, not in concert with any other entity. This alone precludes QwikCut from pursuing a continuing-violations theory. *See Zenith*, 401 U.S. at 338 (emphasizing that the doctrine involves "a continuing conspiracy" and a cause of action accrues when a "plaintiff is injured by an act of the defendants," plural). On top of that, for the reasons that follow, QwikCut has not sufficiently alleged any subsequent anticompetitive acquisition that could even arguably constitute a continuing violation of the antitrust laws or further "overt act," or that independently inflicted "continuing and accumulating harm." *See id.*

***Insufficiently Pled Acquisitions.*** QwikCut's allegations as to Hudl's other acquisitions are cursory references that cannot withstand a motion to dismiss. *See*

24

Compl. ¶ 59 (alleging Hudl has participated in "aggressive M&A activity, repeatedly acquiring horizontal competitors and companies with IP in the sports technology space, including VolleyMetrics, Ubersense, Replay Analysis, Krossover, Sportstec, Wyscout, BlueFrame, SportsContract, FastModel, Balltime, InStat, StatsBomb, and Athletic Data Innovations"). QwikCut provides only threadbare allegations about two more acquisitions of "Realtrack Systems, a Spanish company specializing in wearable human performance technology in 2022, and Titan Sports, a Texas-based leader in GPS player tracking for high schools and clubs"—without explaining how either acquisition even affects the alleged product market. *See id.* ¶ 60.

QwikCut does not allege how any of these alleged acquisitions are part of the relevant product market, or relate to Hudl's DSV and APEX acquisitions, let alone had substantial anticompetitive effects in the relevant market, *see NCAA v. Alston*, 594 U.S. 69, 96 (2021). The allegations are insufficient to raise QwikCut's "right to relief" on the basis of these acquisitions "above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The alleged post-2012 acquisitions cannot serve as the basis for a claim alone or together with other allegations, and cannot serve as continuing violations to extend the statute of limitations by more than a decade to encompass the 2011 and 2012 DSV and APEX acquisitions.

### B. QwikCut's "Technological Barriers" Theory Is Barred By Supreme Court Refusal-To-Deal Precedent

QwikCut's second conduct theory, that "Hudl constructed a series of

25

technological barriers to restrict consumer movement and deter competition," Compl. ¶ 63, fails as a matter of law under longstanding Supreme Court precedent. QwikCut claims that "these barriers include (a) controlling league exchanges and creating technological barriers to prevent Hudl users from entering exchanges with non-Hudl users, (b) preventing individual Hudl users and non-Hudl users from easily transferring video with each other, and (c) rejecting access to [Hudl's] APIs that would facilitate seamless video transfers across Hudl and non-Hudl platforms." *Id.*; *see also, e.g.*, *id.* ¶¶ 7–11, 53–55, 68–69, 71, 85–94, 98, 100–01, 115–16. All of these allegations are different ways of saying the same thing: that Hudl should have opened up more access to its proprietary platform to its rivals.

But the Supreme Court has been clear: a firm's decisions about the terms on which it deals with third parties are not "exclusionary" as a matter of law under Section 2. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Rather, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. There is "no duty to deal under terms and conditions that the rivals find commercially advantageous." *Id.* at 450. *Trinko* and *linkLine* are rooted in sound policy, too. Forcing competitors to share their technology risks chilling the innovation and competition on the merits antitrust law should foster.

26

QwikCut's "technological barriers" theory falls squarely within refusal-to-deal precedent. QwikCut alleges, for instance, that Hudl "refuse[s] to provide the necessary access to its APIs that would enable communication between its platform and others." Compl. ¶ 109. Similar allegations abound. *See, e.g.*, *id.* ¶ 68 ("Hudl has prevented leagues … from creating their own applications to exchange game video across platforms"); *id.* ¶ 85 ("Hudl has made it impractical to initiate Hudl to non-Hudl *or* non-Hudl to Hudl exchanges"); *id.* ¶ 115 ("Hudl prevents its customers from easily transferring their video and metadata to competing platforms like QwikCut"). All of these allegations are variations on the same theme: QwikCut, as a smaller competitor to Hudl, wishes that Hudl would design its platform differently to enable interoperability between QwikCut and Hudl, so that QwikCut could compete more effectively with Hudl. But Hudl is under no legal obligation to design and engineer its platform in a manner that would aid its rivals; Hudl has no "duty to deal" with QwikCut. *See linkLine*, 555 U.S. at 450; *Trinko*, 540 U.S. at 411.

Courts have repeatedly reaffirmed—both before *Trinko* and *linkLine* and since—that the antitrust laws do not obligate one firm to help its competitors. *See, e.g.*, *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (explaining that firms have "no duty" to help competitors "survive or expand" when designing their products); *United States v. Google LLC*, 803 F. Supp. 3d 18, 157–58 (D.D.C. 2025) (rejecting "self-preferencing prohibitions" that would

27

"hamstring" a firm's "ability to compete"). In fact, if QwikCut's "technological barriers" claims were ultimately successful, QwikCut would place this Court in the untenable position of overseeing a redesign of Hudl's technology—a task for which courts are "ill-suited." *See Trinko*, 540 U.S. at 408–09; *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998). Instead, the antitrust laws protect Hudl's design choices. *See Trinko*, 540 U.S. at 408–09 (explaining that "[c]ompelling… firms to share the source of their advantage" would be in "tension with the underlying purpose of antitrust law," as doing so would disincentivize firms from investing in those facilities).

In *New York v. Meta Platforms, Inc.*, the D.C. Circuit rejected a substantively identical "technological barriers" theory. 66 F.4th 288 (D.C. Cir. 2023). There, the plaintiffs alleged that Facebook had "leverag[ed] its dominance to foreclose and forestall the rise of new competitors" by regulating access to its platform, and specifically by withholding API access (after initially permitting it) from "any apps that linked or integrated with competing social platforms" or sought to replicate Facebook's core social networking business. *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 16, 19 (D.D.C. 2021). The D.C. Circuit affirmed dismissal of those claims under *Trinko*, reiterating that the law does not "suppose that a dominant firm must lend its facilities to its potential competitors." *Meta*, 66 F.4th at 305.

The recent decision in *United States v. Apple Inc.* is not to the contrary. 2025

28

WL 1829127 (D.N.J. June 30, 2025). In *Apple*, the court found that the United States had plausibly alleged that the challenged conduct amounted to restrictions on app developers and iPhone purchasers, not Apple's rival smartphone makers. *Id.* at *12. Here, however, QwikCut alleges precisely the factual allegations that the court found were missing in *Apple*: that Hudl is "prevent[ing] rivals from accessing essential data" by "refus[ing] to provide the necessary access to its APIs" to those rivals. Compl. ¶¶ 108–09. Though QwikCut sometimes tries to frame these as restrictions on Hudl's users, at heart, QwikCut is alleging that Hudl refused to make its platform more interoperable with QwikCut's to facilitate more efficient data transfer between them. That is an alleged refusal to deal with a rival, not a customer.

Having pled itself directly into refusal-to-deal precedent under *Trinko* and *linkLine*, QwikCut is left with only one, narrow path to liability: the exception articulated in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). Under *Aspen Skiing*, a Section 2 violation may be found if the defendant (a) unilaterally terminated a voluntary, pre-existing, and profitable course of dealing; and (b) sacrificed short-term profits to harm long-run competition. *See id.* at 605–11; *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 & n.7 (3d Cir. 2022); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020). On top of that, the *Aspen Skiing* exception requires proof of conduct that is "irrational but for its anticompetitive effect," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075

29

(10th Cir. 2013), or whose "only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," *Qualcomm*, 969 F.3d at 993–94.

QwikCut's allegations fall far short of invoking the *Aspen Skiing* exception. There are no allegations that Hudl had a voluntary, pre-existing, profitable course of dealing with QwikCut or any other rival with whom QwikCut would force Hudl to deal. There are no plausible, factual allegations that Hudl sacrificed any short-term profits to entrench a long-run monopoly. Nor are there any plausible allegations that Hudl's policies concerning API access, video exchange between competing software platforms, file formats like .xchange, and so on were wholly irrational but for their anticompetitive effect. *See Novell*, 731 F.3d at 1075. QwikCut's "technological barriers" theory thus fails as a matter of law.[2]

## C.    QwikCut Does Not Plausibly Allege Hudl's Marketing Agreements Are Unlawful

QwikCut's third theory of anticompetitive conduct, like the first two, fails on the face of the complaint. QwikCut alleges that Hudl uses "exclusive partnerships with numerous athletic associations … that prevent its competitors from marketing

---

[2]    The complaint's allegations about a prior partnership between MaxPreps are immaterial. *See* Compl. ¶ 111. MaxPreps is not a rival to Hudl under QwikCut's market definition, and QwikCut's theory is not that data should be more readily transferrable to MaxPreps, but that it should be more transferable *to QwikCut*. There are no allegations that Hudl's former partnership with MaxPreps was profitable, much less that the only rational purpose for terminating it was to harm competition in a market where MaxPreps does not complete.

30

their platforms to coaches at key coaching clinics." Compl. ¶ 120.  But the complaint includes no well-pled allegations tending to show that Hudl's marketing agreements foreclosed competition in the alleged market.

"Exclusivity agreements are generally permissible and are presumptively legal." *CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 454 (D. Del. 2016).  To be an unlawful exclusive agreement under the Sherman Act, "the probable effect of such contracts must harm competition." *Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, 2023 WL 8866555, at *4 (3d Cir. Dec. 22, 2023).  The Third Circuit has previously found that contracts pose a harm to competition where they had "collectively bound *every* purchaser in the product market and locked up 85% of all purchases therein." *Id.*

QwikCut does not allege that Hudl's marketing agreements involve any comparable foreclosure.  Instead, QwikCut alleges that these agreements harmed competition because they precluded competitors from "exhibit[ing] their products" at clinics and excluded them from "key events in the industry for connecting football coaches and introducing them to new technologies."  Compl. ¶¶ 126–27.  But QwikCut's allegations do not explain *why* or *how* Hudl's competitors were unable to market their own services to high schools and colleges, or pitch their own partnerships with state and conference athletic associations, because of Hudl's "exclusive partnerships."  They had other opportunities to reach potential customers.

31

*See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996–998, 1002 (9th Cir. 2010) ("Tyco's market-share discount and sole-source agreements did not force consumers to purchase Tyco's … products").

Elsewhere, the complaint undercuts QwikCut's allegation that exclusive marketing agreements prevented rivals from competing with Hudl. QwikCut alleges that "in 2023, the New Jersey Super Football Conference approved QwikCut to become a second approved vendor (along with Hudl)." Compl. ¶ 131. While the complaint goes on to claim that Hudl offered discounts to schools in that conference to entice them to purchase Hudl services, this concrete allegation—that QwikCut was likewise an approved vendor—demonstrates that Hudl's agreements with conferences and clinics were not precluding QwikCut or others from competing.

The complaint lacks sufficient factual allegations to establish that alleged exclusivity provisions in some of Hudl's marketing agreements harmed QwikCut, let alone any other competitor or the competitive process itself. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 447 (6th Cir. 2007) (en banc) (affirming dismissal of Section 2 claim premised in part on exclusive agreements "because the antitrust laws in the end protect competition, not competitors").

### D. The Complaint Fails to Allege That Hudl Has Engaged in Anticompetitive Bundling Practices

QwikCut's fourth theory of anticompetitive conduct fares no better than its first three. QwikCut alleges that Hudl "engages in various pricing practices that

32

hinder competition on the merits." Compl. ¶ 128. The complaint appears to take issue with two distinct practices: alleged reverse quantity discounts and bundling. *Id.* ¶¶ 129–33. Neither states a claim for relief under Rule 12(b)(6).

*"Reverse Quantity Discounts."* The complaint contains conclusory allegations that "Hudl often increases its prices for customers who want to use the Hudl platform for fewer sports." *Id.* ¶ 129. QwikCut refers to these as "reverse quantity discount[s]." *Id.* But the complaint does not cite any example of this purported practice or explain what products, services, levels of competition, or sports this allegation pertains to. Volume discounting and multi-product pricing are also ubiquitous, generally procompetitive practices. QwikCut's price-increase allegations do not invoke any of the circumstances where pricing itself may be deemed anticompetitive. There are no allegations, for instance, of below-cost pricing. Nor does QwikCut allege that it cannot compete with Hudl on price; in fact, QwikCut alleges the opposite. *See* Compl. ¶ 139.

As the Third Circuit has explained, if a firm "raised its prices, this would encourage other rivals to enter the market and charge lower prices, battling [the firm] through price competition." *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 342 (3d Cir. 2018). Alleged price increases, standing alone, are not sufficient basis for the conduct element of a Section 2 claim.

*Bundling.* The complaint's challenges to Hudl's alleged bundling do not

33

present grounds for antitrust liability, either.   QwikCut alleges that Hudl has "bundled certain products," Compl. ¶ 6, but provides no details on what products Hudl has bundled, apart from generically referencing "Hudl's ticketing services" and "Hudl's sports video analysis platform." *Id.* ¶ 131.  That is far from sufficient under *Twombly* or the Third Circuit's leading case on bundling, *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), to state a claim.

In *LePage's*, the Third Circuit explained that the "principal anticompetitive effect of bundled rebates … is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." 324 F.3d at 155.  As another court in this District explained, in *LePage's*, 3M "linked its bundled rebate to several product lines," and the plaintiff "did not have competing product lines," and thus could not compete with 3M.  *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 557 (D.N.J. 2019).

*Shire* examined the Third Circuit's case law and concluded that there was one other instance in which a bundling claim may survive dismissal: "when a defendant offers a bundled rebate in which it links the competitive product with a product over which the defendant has a monopoly." *Id.*  In *Shire*, the plaintiff and defendant offered competing drugs, but the defendant was alleged to have monopolized the market for those competing drugs by bundling its offering with separate drugs over

34

which the defendant had a monopoly. *Id.*

Neither of these two types of bundling claims are alleged here. QwikCut alleges that Hudl bundled (a) ticketing services with (b) its "sports video analysis platform." Compl. ¶ 131. But QwikCut is not alleging that Hudl bundled the competitive product (its "sports video analysis platform") with a product over which it had a monopoly, because there are no allegations in the complaint regarding Hudl's power in the market for ticketing services. *See Shire*, 375 F. Supp. 3d at 557. It is also unclear from the face of the complaint why it is permissible to bundle "software, hardware, and services that operate together for capturing, storing, analyzing, and exchanging sports video and data," *see* Compl. ¶ 166, but not to add ticketing services. Finally, though the complaint alleges that Hudl offered "schools $5,000 to bundle ticketing services," and describes this as a "massive bundled discount," there are no allegations to contextualize this $5,000 discount (which Hudl disputes) or establish that Hudl's discount was so significant that it would have been economically irrational for schools not to purchase the bundle of sports video analysis and ticketing services. *See id.*

QwikCut also vaguely alleges that "Hudl offers cameras which are the 'only camera that uploads automatically to Hudl,'" and appears to suggest that Hudl has acted unlawfully by bundling its cameras and its software. *See* Compl. ¶ 132. This cannot be squared with QwikCut's market definition, which *includes* "suites or

35

packages of software, hardware, and services," and where no other hardware is alleged to be included in the market other than cameras. *See id.* ¶¶ 166–67. Also, far from alleging that Hudl's software and hardware packages are so cheap that they foreclose competition, *see LePage's*, 324 F.3d at 154, the complaint repeatedly alleges that Hudl's prices are too high. *See, e.g., id.* ¶ 135 ("Hudl's prices have continued to skyrocket"); *id.* ¶ 170 ("Hudl has continuously raised its price"); *id.* ¶ 180 ("consumers continue to use Hudl despite monopolist prices").[3]

QwikCut's bundling claim should be dismissed, as in *Shire*. 375 F. Supp. 3d at 557–58.

### E.     Hudl Is Not An Essential Facility

In a single paragraph, the complaint alleges that "Hudl's conduct is also anticompetitive and unlawful because [its] APIs are an essential facility." Compl. ¶ 119. The Supreme Court has "never recognized" the essential facilities doctrine. *Trinko*, 540 U.S. at 410–11. Historically, the doctrine has been invoked in cases involving railroads, telephone lines, and the electrical grid. *See, e.g., MCI Comm'cns Corp. v. AT&T Co.*, 708 F.2d 1081, 1132–33 (7th Cir. 1983) (telephone lines); *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 855–57 (6th Cir. 1979)

---

[3]   To the extent QwikCut alleges that Hudl has anticompetitively bundled multiple *sports* within its "sports video analysis platform," that claim is insufficiently pled, *see* Compl. ¶¶ 129–30, inconsistent with QwikCut's market definition, and equally true of QwikCut's own multi-sport bundling, *see id.* ¶¶ 139, 169.

(discussing decisions involving railroads and the electrical grid). While Hudl's sports video platform is innovative and valuable, it is not so essential as those utilities were, and it would be unreasonable to apply the doctrine in these circumstances.

The Third Circuit has explained that the essential facilities doctrine may apply only "when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Kerwin v. Casino*, 802 F. App'x 723, 727 (3d Cir. 2020) (per curiam) (citing *Alaska Airlines, Inc. v. United Airlines*, Inc., 948 F.2d 536, 542 (9th Cir. 1991)). QwikCut must plead all the following: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id.* (citing *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996)).

QwikCut's single paragraph does not remotely satisfy these four requirements. QwikCut does not plead any facts establishing the inability of any competitor to reasonably duplicate the file exchange systems and formats that QwikCut would like this Court to order Hudl to develop. Nor does QwikCut plead any facts demonstrating that Hudl has denied "the use of [its] facility to a competitor," when it is undisputed that Hudl permits users to download and transfer their data to competing platforms, and QwikCut just wants Hudl to undertake the

37

investments and engineering work needed to make it even easier to transfer data from Hudl to QwikCut.  *See* Compl. ¶ 115 ("By withholding API access to anyone . . . Hudl prevents its customers from easily transferring their video and metadata to competing platforms like QwikCut").  The complaint's conclusory, unsupported allegation that "Hudl could easily provide API access at little or no cost" does not satisfy the fourth factor the Third Circuit articulated in *Ideal Dairy Farms*.

QwikCut's essential facilities claim is just an effort to get a federal court to compel Hudl to redesign its platform in order to help QwikCut.  This is improper. *See Monarch Ent. Bureau, Inc. v. New Jersey Highway Auth.*, 715 F. Supp. 1290, 1300 (D.N.J.) (defining an essential facility as one "which is not merely helpful but vital to the claimant's competitive viability"), *aff'd*, 893 F.2d 1331 (3d Cir. 1989). This Court should instead follow the Supreme Court's more recent guidance in *Trinko* and *linkLine* and refrain from compelling Hudl to allow Hudl's rivals to access its platform on QwikCut's preferred terms.

### F.    QwikCut's "Playbook" Allegations Fail As A Matter Of Law

Finally, because none of its conduct theories states a Sherman Act claim individually, QwikCut attempts a so-called "monopoly broth" or "course of conduct" claim. QwikCut alleges that "Hudl has written—and carried out—an entire playbook of anticompetitive conduct," and then references all of the above conduct theories together.  Compl. ¶ 133.  QwikCut cannot save its deficient allegations by

38

aggregating them together into one claim.

The Third Circuit has explained that courts may consider "the anticompetitive effect of [the defendant's] exclusionary practices considered together" only *after* the challenged acts are first found to be exclusionary. *LePage's*, 324 F.3d at 159, 162. QwikCut has not carried its burden, at this stage of the proceedings, to allege that any of Hudl's challenged conduct has a substantial "anticompetitive effect." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402, 407–08 (3d Cir. 2016). To have anticompetitive effect, an action "must harm the competitive *process* and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam). QwikCut has not alleged facts suggesting that any of Hudl's conduct—much less all of it—has substantially harmed competition in the alleged market, for all of the reasons explained above. There is thus nothing to be aggregated under *LePage's*.

Courts routinely reject efforts to lump lawful conduct into an antitrust claim. *See, e.g.*, *Microsoft*, 253 F.3d at 78 (reversing the district court's conclusion that "Microsoft's course of conduct separately violates § 2 of the Sherman Act"); *Facebook*, 549 F. Supp. 3d at 46–48 ("lawful unilateral refusals to deal cannot be combined with other conduct, lawful or unlawful, into an overall scheme of monopoly acquisition or maintenance that can be separately challenged"). As another court in this Circuit explained, when each of a defendant's alleged acts are

39

lawful, so too is the supposed course of conduct: "five wrong claims do not make a right." *3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, at *12 (D. Del. Aug. 15, 2019); *accord linkLine*, 555 U.S. at 457.[4]

## CONCLUSION

The complaint should be dismissed with prejudice in its entirety.

---

[4] QwikCut also fails to plausibly allege that Hudl has acted with the specific intent required for an attempted monopolization claim. *See Phila. Taxi*, 886 F.3d at 341. The complaint's intent allegations are wholly conclusory, *see* Compl. ¶¶ 45, 49, 69, 118, 133, and suggest nothing more than "an intent to compete vigorously," *Spectrum Sports*, 506 U.S. at 459.

Dated:  June 15, 2026

Respectfully submitted,

*/s/ Liza M. Walsh*

Liza M. Walsh
Katelyn O'Reilly
Lauren R. Malakoff
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel.: (973) 757-1100
lwalsh@walsh.law
koreilly@walsh.law
lmalakoff@walsh.law

Devora W. Allon, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
devora.allon@kirkland.com

Craig S. Primis, P.C. (*pro hac vice*)
Luke P. McGuire (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 389-5000
craig.primis@kirkland.com
luke.mcguire@kirkland.com

*Counsel for Defendant Hudl, Inc.*

41